IN THE DISTRICT OF THE UNITED STATES OF AMERICA

FOR THE SOUTHERN DISTRICT OF ILLINOIS

```
-----------------------------------------------------------------
UNITED STATES OF AMERICA,          |
                                   |
                 Plaintiff,        |
                                   |
v.                                 | Case No. 22-cr-30024-SPM-1
                                   |
STEVEN DORFMAN,                    |
                                   |
                 Defendant.        |
-----------------------------------------------------------------
UNITED STATES OF AMERICA,          |
                                   |
                 Plaintiff,        |
                                   |
v.                                 | Case No. 22-cr-30024-SPM-3
                                   |
JOHN A. SAND,                      |
                                   |
                 Defendant.        |
-----------------------------------------------------------------
```

Transcript of Jury Trial - Day 3 - AM Session
January 31, 2024

Proceedings held in person before
the Honorable **STEPHEN P. McGLYNN**,
United States District Judge Presiding

East St. Louis, Illinois

```
-----------------------------------------------------------------
```

**REPORTED BY:**        **HANNAH JAGLER**, RMR, CRR, FCRR
                     Official Court Reporter
                     750 Missouri Avenue
                     East St. Louis, Illinois 62201
                     618-482-9481
                     Hannah_Jagler@ilsd.uscourts.gov

Following proceedings recorded by mechanical stenography;
transcript produced by computer-aided transcription.

**APPEARANCES**:

FOR PLAINTIFF:           **SCOTT A. VERSEMAN**
                         Assistant U.S. Attorney - Fairview Heights
                         9 Executive Drive, Suite 300
                         Fairview Heights, IL 62208
                         618-628-3713
                         Scott.verseman@usdoj.gov

                         **PETER T. REED**
                         U.S. Attorney's Office - Fairview Heights
                         9 Executive Drive
                         Fairview Heights, IL 62208
                         618-628-3700
                         Peter.reed@usdoj.gov


FOR STEVEN DORFMAN:      **PAUL E. SIMS**
                         Sims & Bailey, L.L.C.
                         4387 Laclede Avenue, Suite A
                         St. Louis, MO 63108
                         314-534-0800
                         Blast357@gmail.com

FOR JOHN A. SAND:        **MATTHEW A. RADEFELD**
                         Frank, Juengel & Radefeld
                         Attorneys at Law P.C.
                         7710 Carondelet Ave., Suite 350
                         Clayton, MO 63105
                         314-725-7777
                         Mradefeld@fjrdefense.com

1

**INDEX**

2

PAGE

3  WITNESS: **JOANN VOLK**

4      Cross-Examination By Mr. Radefeld......................  4

5      Cross-Examination By Mr. Sims..........................  40

6      Redirect Examination By Mr. Verseman...................  45

7      Recross-Examination By Mr. Radefeld...................  50

8      Recross-Examination By Mr. Sims.......................  52

9  WITNESS: **KATRINA RUTH**

10      Direct Examination By Mr. Verseman....................  57

11      Cross-Examination By Mr. Sims.........................  92

12      Cross-Examination By Mr. Radefeld.....................  96

13      Redirect Examination By Mr. Verseman..................  107

14  WITNESS: **TERENA BAKER**

15      Direct Examination By Mr. Reed........................  110

16

17

18

19

20

21

22

23

24

25

<u>**TRANSCRIPT OF PROCEEDINGS**</u>

(Proceedings commenced at 9:06 a.m.)

(Jury enters at 9:06 a.m.)

THE COURT:  Good morning, everyone.  Please be seated.  Good morning.

THE WITNESS:  Good morning.

THE COURT:  Have a seat.  You are still under oath.

THE WITNESS:  Okay.

THE COURT:  We are in cross-examination.

MR. RADEFELD:  Yes, please, Your Honor.  I'm going to start today.

CROSS-EXAMINATION

BY MR. RADEFELD:

Q    Good morning, Professor.

A    Good morning.

Q    Now I thought I heard you testify yesterday that you were a lobbyist at one point in time; is that correct?

A    That's right.

Q    Okay.  And so your job as a lobbyist was to try to persuade lawmakers to pass legislation that was in favor of your constituents.  Is that basically what a lobbyist does in your position?

A    Yes.

Q    Okay.  So at that time in your position as a lobbyist in DC,

1       were you an advocate for Obamacare?

2   A   Yes, the AFL-CIO supported passage of the Affordable Care

3       Act.

4   Q   Okay.  And in regard to your preparation for testifying in

5       this case, did you prepare any sort of affidavit or report in

6       regard to your research of the facts of this case?

7   A   I had a statement that I submitted, and then notes that were

8       shared yesterday that I had prepared, you know, over the

9       weekend in preparation for today.

10  Q   Okay.  I gotcha.  But no sort of affidavit or anything of

11      that sort?

12  A   Unless I'm misunderstanding the question, no.

13  Q   No, I don't think you are.

14  A   Okay.

15  Q   I think you got it.  So you're just saying you wrote the

16      notes that we got yesterday?

17  A   That's -- yes.

18  Q   Okay.  And the statement was more or less I believe what the

19      prosecution put in their notice of expert; is that right?

20  A   That's right.

21  Q   Okay.  Stating your opinions that you stated yesterday?

22  A   Right.

23  Q   Okay.  And what did you review in regard to the facts of this

24      case?

25  A   I had seen the indictment and I knew it was the period 2016

1          to 2018.

2     Q    Okay.  Was that all that you reviewed in regards to the facts

3          of this case?

4     A    Yes.

5     Q    Okay.  Did you interview anybody?

6     A    No.

7     Q    All right.  Did you listen to any of the interviews of anyone

8          who worked at Simple Health?

9     A    No.

10    Q    Did you listen to any of the phone calls between a sales

11         agent for Simple Health and a potential customer?

12    A    No.

13    Q    Okay.  And as you sit here today, you can't testify as to

14         what the employees of Simple Health were told in regard to

15         the products that they were selling on behalf of a TPA, can

16         you?

17    A    Not the particular salespeople to the individuals in this

18         case, no.

19    Q    Okay.  And when I say a TPA, what is a TPA to your knowledge?

20    A    The context in which I know it is third-party administrator

21         employers use insurance companies to process claims and sort

22         of manage the benefits.

23    Q    Okay.  So more or less, a TPA, you would agree with me, are

24         the ones who kind of hold the policies, but agencies like

25         Simple Health may sell the policies for those people, the

TPA?

A    I don't know how it works in the case of entities like Simple
     Health.  I understand it in the case of employers that
     self-fund, meaning they don't use an insurance policy, they
     use their assets to pay claims and then they hire an
     insurance company to just sort of pay the claims, set up the
     network.  It's a different context than I think what is at
     issue today.

Q    Okay.  All right.  And so basically, before I get into the
     details pertaining to the issue of why we're here today, I
     want to talk about some other things you worked on in your
     career.  Your current place of employment, and I want to make
     sure I get it right, is Georgetown University's McCourt
     School of Public Policy Center on Health Insurance Reforms;
     is that right?

A    Correct.

Q    Okay.  And so there's an entire area of Georgetown University
     that is working on doing research or policy research and
     analysis on consumers' access to adequate and affordable
     health insurance; is that right?

A    Correct.

Q    Okay.  And in fact, you had testified earlier that you have
     written, it looks like, dozens of articles on some very
     serious issues that pertain to insurance, namely health
     insurance related issues; isn't that right?

1   A   Yes.

2   Q   Okay.  And a lot of these issues pertain to consumers getting

3        or having insurance but they end up still having to pay large

4        sums of money; isn't that right?

5   A   Yes, for some of the papers, yes.

6   Q   Okay.  And the consumers have to pay these costs although

7        they do have insurance; is that right?

8   A   So one area of research is where the current law still

9        requires people to pay substantially out of pocket, and ways

10       to improve that, policies that would improve that, including

11       looking at state efforts to do so and drawing from that as

12       examples for federal policy.

13   Q   Okay.  And so people are having to pay large sums of money

14       out of their pocket even with a major medical policy; isn't

15       that right?

16   A   But it is -- yes, but it is capped, and so for someone who

17       has a hundred thousand dollar hospital bill, that is an

18       important cap to have.

19   Q   And that cap varies from person to person; isn't that right?

20       Policy to policy?

21   A   No.  If it is an insurance policy that is subject to federal

22       law, the Affordable Care Act, it must be -- there's a maximum

23       limit for every policy.  Plans may have a lower limit, but

24       they cannot have a limit that exceeds that so that

25       individuals pay more out of pocket than what the federal law

1    would require.

2                    THE COURT:  Counsel, I think you ought to focus

3        your questions with respect to the relevant times for your

4        clients.

5                    MR. RADEFELD:  Yes, sir.

6                    THE COURT:  The law today with respect to

7        insurance may be different than -- it may be more favorable to

8        insureds today than it was 2016, 2018.

9                    MR. RADEFELD:  Yes, sir.  Thank you very much.

10                   THE COURT:  So why don't you focus in that area.

11   BY MR. RADEFELD;

12   Q    As the judge is saying, back in 2016, 2018, were the caps

13        higher or lower than they are today?

14   A    The federal law that imposes a cap has been in place since

15        2014.  What changes year to year is the amount, because the

16        law also included what's known as indexing, so it grows every

17        year, relative to increasing costs and employer-sponsored

18        coverage.  It's just a way to keep the -- the cap does grow

19        year to year.

20   Q    Okay.

21   A    But by a federal-law defined increment every year.

22   Q    Okay.  But again, more or less what I was saying, you have

23        been -- part of what you're working on is less expensive

24        health care coverage for consumers; isn't that right?

25   A    Right.

1  Q   Okay.  And so in fact, a lot of the articles that you have

2      written seem to have a tone of, no cost insurance would be

3      ideal; is that right?

4  A   No.  I don't think that's been the policy goal or what we've

5      written about, no.  I mean, for some low income individuals

6      under current law, you know, if you have the lowest income

7      and qualify for financial help in the marketplace, you can

8      get a $0 premium for a plan, and that will expire at some

9      point, but not $0 for your premium, for your cost-sharing,

10     never pay out of pocket for a marketplace plan.  That's not

11     been the policy or something we've written about.

12 Q   Isn't that what you advocate for?

13 A   No.

14 Q   No?  Okay.  And you would agree with me that traditional

15     health plans have not been able to stem high-cost increases

16     over the last several years, 2014 to 2018; right?

17 A   Health care costs have gone up.

18 Q   They've gone up?

19 A   For employers and for insurance companies.

20 Q   And even individuals; right?

21 A   With the policies they buy.

22 Q   Yeah.  And so even with the enactment of the Affordable Care

23     Act, insurance is still expensive?

24 A   Insurance is a reflection of how much the cost of care is.

25     So if hospitals charge more, if doctors charge more, that

1    gets built into the costs that the insurance company charges.

2  Q  Okay.  And so there's a growing trend, you would agree, in

3     the United States to tear down or try to tear down this

4     traditional health plan model and for individuals to try

5     something different; isn't that right?

6  A  No.  I don't -- that's not something we've advocated for.

7  Q  Okay.  Not something you advocate, but, I mean, there are

8     individuals out there who are trying not to have to pay the

9     high costs of a major medical plan and try other methods in

10    which to try to fray those costs; right?

11 A  I'm not sure I understand the question.  I mean, there are

12    entities out there that are promoting different insurance and

13    policy designs.

14 Q  Exactly.

15 A  I can't speak to that.  I don't...

16 Q  And that's what I was getting at.  Because it's true that not

17    everyone in the US is eligible to get a subsidy to fray the

18    costs of an ACA plan; isn't that right?

19 A  Presently, yes, but during that period, it was capped at four

20    times the poverty level for the premium tax credits.

21 Q  And I want to be clear, when I am talking about things, I'm

22    talking about it back in -- what's pertinent to this.

23 A  Yes.

24 Q  Is that fair?

25 A  Mm-hmm.

1  Q  Okay.  Because if a person makes too much money but not

2     enough to be able to afford a major medical plan, they can't

3     get the subsidies, that they make too much; is that right?

4  A  At the time, if they made more than four times the poverty

5     level, yes.

6  Q  Okay.  And it's possible, you would agree with me, that in

7     order to get a subsidy or to even check to see if they're

8     eligible for one, the people need to know where to go to get

9     that; isn't that right?

10 A  Yes.  There are navigators and there have been, as part of

11    the law, enrollment assisters, and providers can help people

12    understand their coverage options.

13 Q  Okay.  And that's different than the -- an insurance company;

14    right?  I mean, that's not the job of the insurance company

15    who's selling policies to tell people where to go and how to

16    get subsidies, is it?  Is that required under the law?

17 A  No, it's not required under the law.

18 Q  Okay.

19 A  But it is required to be truthful about, you know, open

20    enrollment and the availability of subsidies.

21 Q  Correct.  If it's asked; is that right?

22 A  If it's asked, but in my research recently, even without

23    asking, sometimes those -- those falsehoods were shared.

24 Q  Those falsehoods were shared.  That people didn't tell them

25    about subsidies being available?

1    A    Yes.

2    Q    Okay.  Are they required to do that?

3    A    They're required to tell the truth and it's part of the

4         broker suitability standards.  States regulate brokers and

5         they're required under the professional code of conduct and

6         also under state laws to be accurate in their description of

7         products and to sell --

8    Q    Well, I feel like you're not answering my question.  My

9         question is --

10                  MR. VERSEMAN:  Judge, I object.  May the witness

11        be allowed to answer the question?

12                  THE COURT:  You're starting to offer opinions on

13        law.

14                  MR. RADEFELD:  I can move on.

15                  THE COURT:  Stop there and why don't you rephrase

16        the question.

17                  MR. RADEFELD:  I can move on.

18   BY MR. RADEFELD:

19   Q    And so there are different products out there where some

20        people can experiment with new ways to pay their medical

21        expenses; isn't that right?

22   A    Yes.

23   Q    Such as short-term policies you talked a little bit about

24        yesterday; is that right?

25   A    They're not new.  They've been around since -- for a long

```
 1         time.
 2    Q    A long time.  How long do you think short-term policies have
 3         been around?
 4    A    I do not know.  But they had a different purpose before the
 5         Affordable Care Act than is needed now.
 6    Q    Okay.  Alternatives like Christian sharing ministries; isn't
 7         that right?
 8    A    Yes, those have been around a long time.
 9    Q    They've been around a long time as well?
10    A    Yes.
11    Q    And these Christian sharing ministries, it's not even
12         insurance at all but rather a cooperative in which members
13         pay one another's bills; is that right?
14    A    It's not insurance.  It's a voluntary program.
15    Q    Okay.  And it's also a discount program as well?
16    A    Some may offer a discount card but that's not what a health
17         care sharing arrangement is.
18    Q    Okay.  But it's a legitimate product or option for paying
19         health care expenses, is it not?
20    A    It lacks the guarantee or contract that insurance does.  So
21         there is no guarantee that you ever get paid for anything,
22         even if it's listed in the membership guidelines that it
23         would be a covered service in the way that people would read
24         their health insurance policy.  So it is very different.
25    Q    Okay.  All right.  But in November of 2023, you actually
```

1      wrote an article called "Health Care Sharing Ministries Leave

2      Consumers With Unpaid Medical Claims"; isn't that right?

3 A  That's right.

4 Q  Okay.  And so these sharing ministries are not doing

5      everything the consumer thought they would apparently; is

6      that right?

7 A  Right.

8 Q  Okay.  And to your knowledge, in your research, are the

9      people who get others to get involved in these ministries

10     being prosecuted for fraud cases?

11 A  I'm not aware of all the litigation.  I know there's

12     something right now in New Mexico against one entity.

13 Q  In a civil matter; correct?

14 A  I don't know.

15 Q  Okay.  And you also wrote an article in April of 2023 titled

16     "The No Surprises Act, Perspectives on the Status of Consumer

17     Protections Against Balance Billing"; isn't that right?

18 A  That's right.

19 Q  Okay.  And I know you talked a little bit yesterday about

20     balance billing, and you talked about how a person can go to

21     a hospital and they get a procedure and then the

22     anesthesiologist in there is not part of the network; isn't

23     that right?

24 A  Correct.

25 Q  And so when a consumer purchases their major medical plan, do

1        you know whether or not they were told about, that they would

2        have to deal with this balance billing?

3    A   I'm not sure I understand the question.

4    Q   Sure.  When a person is buying a major medical plan, okay,

5        are they being told, to your knowledge, in your research,

6        that there's -- issue of balance billing could even come up?

7    A   It's part of understanding what the network means, to go in

8        network versus out of network.

9    Q   Okay.  And so out of network means that a doctor is not part

10       of that PPO or --

11   A   Right, and there's no contract there that requires them to

12       bill you for no more than what they're taking in their co-pay

13       and what the insurance plan pays.

14   Q   Okay.  And so that means that when they buy their plan, they

15       have to be told what out of network means; right?

16   A   It is typically a part of the materials that are shared.

17   Q   Okay.  And the materials that are shared are something

18       like -- there's statement of benefits?

19   A   Well, the summary of benefits and coverage that I mentioned

20       yesterday is required of every plan, and it would include

21       that information.

22   Q   Okay.  And so I guess this is such a problem that the

23       government actually passed this No Surprises Act; is that

24       right?

25   A   Yes.

1  Q   Okay.  Pertains to consumers being surprised and having to
2      pay more money than they thought they would have to?
3  A   Yes, and the circumstances were people chose to go to an
4      in-network hospital for in-network surgery, and could not --
5      did not have any control over an anesthesiologist, or the
6      radiologist that reads the, you know, the imaging is out of
7      network.  So it's very specific circumstances where it's
8      outside the consumer's control or knowledge.
9  Q   Okay.  But they call it a surprise; right?  Even though it's
10     explained in their summary of benefits, it's still -- had to
11     be passed by Congress, a surprise?
12 A   But importantly, they have no control over -- you know, as I
13     said, another example is, you're in the ambulance headed to
14     the ER.  You're not pulling up your provider directory to
15     check to see if the hospital where you're headed is in
16     network.  You have no control over that.  So that's one of
17     the circumstances in which the federal law now says you
18     cannot balance bill those individuals.  They had no choice
19     but to go to the ER where the ambulance takes them.
20 Q   Okay.  And so do you know whether or not those companies or
21     those insurers that were balance billing, were they
22     prosecuted for fraud to your knowledge?
23 A   Prior to the federal law, it was not a crime to balance bill
24     in those circumstances.  That is what it means to go out of
25     network.  But again, you know, it's recognized as a problem

| | |
|---|---|
| 1 | where people were getting balance bills, surprise bills, |
| 2 | where they did not know they were out of network or could not |
| 3 | control -- you know, control where they were going in an |
| 4 | ambulance.  And so federal law saw it as a problem and |
| 5 | prohibits balance billing in those circumstances. |
| 6 | Q   Okay.  So to answer my -- |
| 7 | A   There would be civil penalty, penalties for providers or |
| 8 | insurance plans that do not comply with that law. |
| 9 | Q   So there would be civil penalties but not criminal penalties; |
| 10 | correct? |
| 11 | A   Yes. |
| 12 | Q   Okay.  And so my original question is, to your knowledge, in |
| 13 | your research, these -- the people who sold these policies |
| 14 | weren't being prosecuted for fraud, were they, to your |
| 15 | knowledge? |
| 16 | A   No, it wasn't fraud.  It was what was allowed under law until |
| 17 | the passage of the No Surprises Act. |
| 18 | Q   Okay.  As long as it was put in their written statement of |
| 19 | benefits, right, about out of network? |
| 20 | A   Yes. |
| 21 | Q   Okay.  Also in October of 2020, you wrote an article titled |
| 22 | "Trump Administration Promotes Coverage That Fails to |
| 23 | Adequately Cover Women's Key Health Care Needs"; is that |
| 24 | right? |
| 25 | A   Mm-hmm. |

| | | |
|---|---|---|
| 1 | Q | You have to speak out loud, I'm sorry. |
| 2 | A | Yes.  I'm sorry. |
| 3 | Q | That's all right.  Thank you.  And so the Trump |
| 4 | | administration was apparently promoting health insurance |
| 5 | | coverage claiming to do certain things that it really didn't? |
| 6 | A | Short-term plans, yes, they were promoting short-term plans. |
| 7 | Q | Okay.  Was what the Trump administration promoting as far as |
| 8 | | coverage?  Was it misleading in regard to women's health care |
| 9 | | needs? |
| 10 | A | Not sure how to answer that.  Short-term plans do not have to |
| 11 | | comply with all the consumer protections I talked about |
| 12 | | yesterday.  And the administration had made it easier to get |
| 13 | | short-term plans and have them for longer periods of time, |
| 14 | | longer than short term, for up to a year.  They changed the |
| 15 | | federal rules that apply to those plans. |
| 16 | Q | All right.  And so in October of 2018, you wrote an article |
| 17 | | titled "Short-Term Health Plan Gaps and Limits Leave People |
| 18 | | At Risk"; is that right? |
| 19 | A | Right. |
| 20 | Q | Okay.  And so we mentioned this sort of alternative to a |
| 21 | | major medical plan, again, this short-term health plan that |
| 22 | | you just talked about with the Trump administration.  And |
| 23 | | real briefly, just -- what's the short-term plan again? |
| 24 | A | Under current regulations -- |
| 25 | Q | Talking about the timeframes again. |

1   A   I'm not entirely sure when that rule took effect, but it was

2       probably at least for some part of that period.  They were

3       available for up to 12 months and could be renewed for up to

4       36 months of coverage, but they could discriminate against

5       people based on preexisting conditions.  So they could alter

6       the benefits that they provided, they could turn people away,

7       they could charge them higher premiums if they had a

8       preexisting condition.  And they were practices known as

9       rescissions in which people paid premiums, had the policy,

10      and then submitted a claim that the insurance company would

11      go back and say, yeah, that was actually a preexisting

12      condition.  You might not have known that that chest pain was

13      a heart condition.  We're denying the claim and canceling

14      your policy.  So there were a lot of practices that were not

15      consumer friendly.

16  Q   Okay.  And you wrote that again back in October of 2018, kind

17      of close to the timeframe that we're talking about --

18  A   Yes.

19  Q   -- in this case; is that right?  Okay.  And so the risk to

20      the consumer in a short-term plan, that the premiums could

21      change?

22  A   Yes.

23  Q   Okay.  And do you know, was that typically part of the

24      consumer summary of benefits that they would obtain?

25  A   That is one of those policies -- insurance options that

1    doesn't have to provide a summary of benefits and coverage,

2    so that would not be information that had to be shared.

3  Q  Okay.  Didn't have to be shared, but if they did -- if a

4    consumer did receive a summary of benefits, it didn't have to

5    be there or not?

6  A  I'm not aware of a short-term plan that voluntarily offered a

7    summary of benefits and coverage that's required of

8    different -- other types of insurance.

9  Q  So if somebody who sold short-term plans did in fact provide

10    a summary of benefits, would you consider that to be kind of

11    above and beyond what they were required to do?

12  A  Certainly wasn't an obligation under federal law.

13  Q  Okay.  And so again, these short-term health plans, they are

14    legitimate products, are they not?

15  A  They have a very specific and narrow purpose in the current

16    health coverage system.  We talked yesterday about the

17    various life changes and circumstance changes that can allow

18    a person to sign up for comprehensive coverage that cannot

19    discriminate outside of open enrollment.  And one of those is

20    if you lose other coverage and, you know, you want to have

21    coverage prior to open enrollment, that's an opportunity to

22    sign up for comprehensive coverage.  So there is currently a

23    proposal to redefine these plans so they can only last up to

24    three months, to truly cover short gaps in coverage.

25  Q  Okay.  So --

1  A    Not --
2  Q    My question, the timeframe back then, they were legitimate
3       products?  Even President Trump you said was promoting these,
4       was he not?
5  A    Yeah, they were recognized by federal law, yes, and the
6       administration promoted them.
7  Q    Okay.  So to answer my question, they were legitimate
8       products?
9  A    I mean, they're recognized.  I don't -- they did not offer
10      comprehensive coverage.  They do not have to comply with
11      important consumer protections.
12 Q    Okay.  I guess I should put it this way.  They're not
13      illegal; right?
14 A    That's right.
15 Q    Okay.  And do you know whether consumers were told about
16      these -- well, never mind.  We already went through that.
17                  And you gave some opinions yesterday as to
18      what a consumer should know when purchasing a limited benefit
19      plan.  Do you recall testifying yesterday --
20 A    Yes.
21 Q    -- to all that?  Okay.  What would a person typically receive
22      from the insurance carrier that they would purchase their
23      policy from that would explain in detail the benefits they're
24      receiving from the plan that they purchased?  It's called the
25      summary of benefits; isn't that right?

1    A    Summary of benefits and coverage, yes.

2    Q    Okay.  Because this summary of benefits is going to give them

3         presumably all the information a consumer needs to know as to

4         what it is that they purchased; isn't that right?

5    A    Most of what they need to know, yes.

6    Q    Okay.  And what exactly is covered and what is not covered?

7    A    At what cost, what out-of-pocket cost, what it costs to get a

8         lab, what it costs to go to a doctor in the lowest

9         cost-sharing tier, how to find out if your drug is covered,

10        if your doctor is in network, exclusions not covered under

11        the policy.  And then three scenarios that are typical for

12        people, what you might expect to pay if you were having a

13        baby, had a simple fracture, or Type 2 diabetes, just so

14        people sort of understand how their costs might look under

15        that policy.

16   Q    Okay.  And so that's a lot of information and there are

17        various ailments that a person can have; right?

18   A    Mm-hmm.

19   Q    And so a lot of times in those summary of benefits, they kind

20        of condense it down into bigger, larger areas; isn't that

21        fair to say?

22   A    I mean, the scenarios, you're right, don't apply to everyone.

23        They were chosen because they are typical.  But the other

24        information on the other pages is pretty detailed.  It's, you

25        know, your co-pay for a hospital visit, your co-pay for a

1  doctor visit, including for, you know, plans that have tiers

2  of providers where some cost more to see than others.  It's

3  pretty detailed.

4  Q  Yeah.  And so if a consumer is not buying a major medical

5  plan and trying to go to this alternative route that we

6  talked about a little bit, then the consumer needs to go

7  through these -- if they did in fact receive a summary of

8  benefits, they would need to go through that themselves to

9  figure out what exactly all those little detailed things that

10  you just talked about are part of their plans, so there are

11  no surprises; is that correct?

12  A  I mean, you know, there are reputable brokers that will go

13  through that with you that know very well the market and the

14  policies that they are selling, and as I was saying, they

15  have to comply with state requirements that they sell an

16  individual a suitable policy.  They're called suitability

17  standards.

18  Q  Okay.

19  A  And so they can get in trouble with state regulators if they

20  are trying to sell a policy that is not well suited to the

21  individual that is buying it.

22  Q  Again, I'm talking about the consumer, though.  They would

23  have the summary of benefits in front of them to read to be

24  able to see what was covered --

25  A  They would have it and they would have individuals to go

1     through it with them if they needed that help, either an

2     enrollment assister through the marketplace or a broker.

3  Q  Okay.  But it's not a requirement under the law to sit and

4     talk to this person about every part it?

5  A  No, it's designed to be something you can use on your own and

6     certainly it's part of what I'm offered and everyone's

7     offered during their open enrollment season for their

8     employer.  If I wanted to talk to my HR department, I could,

9     but it's intended to be a standalone document you can read

10    and use to understand what you're buying and later to use

11    your policy and understand the costs that will apply.

12  Q  So you're just talking about an ideal scenario, someone would

13    sit down with this individual and go through every single

14    part of it; is that right?

15  A  No, if they felt they needed help, those resources are

16    available.

17  Q  Okay.  Such as calling a customer service line, asking what

18    certain things are in their policy and going through line by

19    line with them, is that a possibility?

20  A  Well, as I said, in an employer context, I would call my HR

21    department.  For the individual market, in the marketplaces,

22    they all have an option to find -- to get local help, it's

23    called, and you just enter in your zip code and they will

24    show you where there are brokers near you or enrollment

25    assisters.

1  Q   Okay.  And so what you just described was somebody who is

2      getting their insurance through their employer?

3  A   Or the marketplace -- when I said the marketplace, Obamacare,

4      marketplace is where people can get comprehensive policies

5      with premium tax credits and out-of-pocket --

6  Q   I'm only talking about asking somebody for help.

7  A   Right.

8  Q   To go through it.

9  A   And the summary of benefits and coverage apply to marketplace

10     plans too, not to short-term plans, not to fixed indemnity or

11     limited benefit plans.

12 Q   Okay.  So if a person, though, received a fixed indemnity

13     plan like we were just talking about and they needed an

14     explanation as to the documents they received -- let's say

15     they get a copy of their summary of benefits.  Okay?

16 A   It's not required --

17 Q   Not required, no.  They went above and beyond and gave their

18     consumers a copy of their summary of benefits.  Like you

19     said, getting a copy of that --

20 A   Following the format and regulation, just so I understand.

21 Q   I'm sorry?

22 A   There's a specific format.  There's a, you know, a sample

23     document under federal regulations that insurers must

24     complete.  So just so I understand, we're talking about a

25     fixed indemnity plan that doesn't have to provide that

1    document is voluntarily providing that very same document in

2    the same format?

3  Q  Yes.

4  A  Okay.

5  Q  And so let's say they provide in the same format that the

6    federal legislatures are advocating for or have passed that

7    they're required to do, and they provide that information and

8    the person has the ability to be able to call customer

9    service and go through that, every step of their plan with

10    them.  Would you agree with me that's kind of going above and

11    beyond what is required of them?

12  A  It's certainly not required under law.

13  Q  Okay.  And again, these limited benefit plans that you

14    testified to, they are also not illegal, are they?

15  A  No, but they are intended to be supplemental coverage as I

16    was talking about yesterday, not standalone.

17  Q  Ma'am, my question was, are they illegal?

18  A  Under the definition, no, they are not illegal.

19  Q  Okay.  And you said several times yesterday that it's not

20    insurance; isn't that right?

21  A  Right.  It's a different category under federal law.  When

22    you look at the consumer protections I was talking about

23    yesterday and the plans to which they apply, this is in

24    another category that doesn't have to comply with those

25    requirements.

1    Q    Okay.  But again, not answering my question.  You're talking

2         about different categories.  Different categories of

3         insurance; right?

4    A    Yes.

5    Q    Okay.

6    A    No, they're known as accepted benefits.  They're not even

7         considered insurance.

8    Q    Okay.  So what's it a different category of?  There's major

9         medical.  Is that a category?

10   A    Yes.  This is called accepted benefits under the law.

11   Q    So that's the category?

12   A    Yes.  Includes things like a standalone dental plan,

13        hospital-only coverage, fixed indemnity.

14   Q    Okay.  So I just want to be clear.  Okay?  What are the

15        different categories?  May be more clear that way.

16   A    Insurance and accepted benefits.  And short-term plans is its

17        own category.

18   Q    Okay.  But they're all kind of in the same ballpark of one

19        another; is that right?

20   A    No.  I mean, when you look at all the protections in law, at

21        the bottom, it says where -- the plans to which they apply.

22        It does not apply to those plans.  They're not in the same

23        ballpark.

24   Q    But if insurance is one category and this medical benefits is

25        the other, why even have different categories if they're not

1    in the same ballpark?  Why are they even talked about

2    together at all?

3  A  Under any requirement, you have to -- you have the

4    requirements and then you have to clearly articulate which

5    policies and plans they apply to.  And there's a different

6    category for these.

7  Q  Okay.  And so in the state of Florida -- are you familiar

8    with all 50 states' insurance laws?

9  A  I don't know the specific laws in Florida, no.

10 Q  Okay.  Well, overall, isn't it true that you have to have an

11   insurance license to sell a limited indemnity plan because of

12   the cash benefit part of the plan?

13 A  If you're a broker, you would have to have a license to sell

14   insurance, yes.

15 Q  Okay.  And that goes true with the limited indemnity plan if

16   it has a cash benefit part of it; isn't that right?

17 A  I don't know the specific requirements for brokers in

18   Florida.

19 Q  Okay.  Well, yesterday, we saw a whole bunch of bills from

20   individuals where there would be a discount and then there

21   would be an amount of cash paid by the insurer.  So is that

22   different than insurance?

23 A  Yes.

24 Q  Okay.  Even though they're paying cash?

25 A  Because they are not paying -- again, we were talking

1    yesterday about risk.  They are not paying -- they are not

2    altering their payment based on the cost of the care an

3    individual receives.  They pay a fixed amount.  That's

4    different from insurance, where the insurance -- the risk for

5    a claim or a cost of service being greater than an individual

6    expects, that is a risk that is borne by the insurance

7    company, and the individual just pays their $20 co-pay, for

8    example, whether the doctor charges a hundred or 500.

9  Q   I understand it's a different product.  But the summary of

10   benefits that we talked about, the insurance -- or the

11   insured -- insurer of the limited benefit plan is paying what

12   they promised to pay as detailed in the summary of benefits;

13   does that sound right?  If they're paying that?

14 A   I mean, I've seen one once.  I would be curious to understand

15   how they complete a summary of benefits and coverage for a

16   fixed indemnity plan.  I have seen one where it was unclear.

17   The summary of benefits in coverage says specifically if you

18   go to the doctor, you will pay like two different columns;

19   right?  The document I saw for a fixed indemnity plan in the

20   last year, it was just a number.  And it would not say if the

21   plan was paying that amount or the individual was paying that

22   amount.

23 Q   So if it said that the insurance company was going to pay a

24   certain amount, then that's different than what you're

25   talking about; right?

1  A   Right.

2  Q   Okay.  Because every time a person goes to the doctor, we

3      don't -- we don't know what's going to happen there or what

4      has to be done; is that right?

5  A   Right.

6  Q   Okay.

7  A   Or even how much they're going to charge from doctor to

8      doctor for an office visit.

9  Q   Exactly.

10 A   But under insurance policy, you're going to pay your co-pay

11     as part of the contract between the insurance company and the

12     provider.

13 Q   Okay.

14 A   No matter what the cost is.

15 Q   Okay.  But again, if the consumer receives a summary of

16     benefits and all this is spelled out for them, then you would

17     agree with me that the consumer has knowledge?

18 A   If it says, this is what -- if you have this service, this is

19     what you will pay, that is clearer than --

20 Q   You're comparing that to insurance, the major medical

21     insurance; right?

22 A   Right.  That's the way insurance works.

23 Q   Yes.

24 A   The individual's cap out-of-pocket costs is capped.

25 Q   We've already established that limited indemnity plans are

| | | |
|---|---|---|
| 1 | | different; right? |
| 2 | A | Right.  So I'm just curious how that would be portrayed in a |
| 3 | | summary of benefits and coverage.  If the format is, you will |
| 4 | | pay this amount, but by the definition and the nature of the |
| 5 | | fixed indemnity plan, the plan has a fixed amount.  It would |
| 6 | | have to say, we will pay $20, you'll pay everything else |
| 7 | | regardless of the cost.  And I just don't see how that fits |
| 8 | | in the required format for a summary of benefits and |
| 9 | | coverage. |
| 10 | Q | We're not talking about the required format. |
| 11 | | MR. VERSEMAN:  I'm going to object to the arguing |
| 12 | | with the witness. |
| 13 | | THE COURT:  She's an expert.  She can handle |
| 14 | | herself.  This is cross-examination.  We're getting a little far |
| 15 | | afield.  But she gets -- you have to allow her to answer.  You |
| 16 | | ask a question, you have to allow her to answer it.  However, |
| 17 | | you're to answer the question that's asked, not the question you |
| 18 | | wish was asked.  And the US Attorney's Office can clear up any |
| 19 | | confusion on redirect.  Next question. |
| 20 | | MR. RADEFELD:  Thank you, Judge. |
| 21 | BY MR. RADEFELD: |
| 22 | Q | We've already established that a limited indemnity is not |
| 23 | | required to provide any sort of summary of benefits |
| 24 | | whatsoever; correct? |
| 25 | A | Right. |

1  Q    Okay.  So I'm talking about the knowledge that is provided to

2       the consumer in a summary of benefits if it is in fact

3       provided by the insurer of the limited indemnity plan;

4       correct?

5  A    Right.  And that's why I asked, though, using the same format

6       required of insurers under federal regulations.  That's why

7       I'm working off this assumption.  You said they are going

8       above and beyond using -- voluntarily providing a summary of

9       benefits and coverage using the same format that is required

10      of insurers.

11  Q   And I'm not talking about the exact same format.  I'm talking

12      about providing them with information.  I'm not trying to say

13      that it's exactly --

14  A    Oh, I'm sorry, that's different -- I thought I heard it

15      differently before.  That's why I was answering a different

16      question.

17  Q    I'm just saying by providing that information, that this is

18      what we are paying, this is what we're -- it just all goes to

19      knowledge; correct?  You had stated some things yesterday

20      that before they buy a plan, they should have this

21      information; isn't that correct?

22  A    If it's very transparent and clear what the obligations are

23      on the individual, as I said, the one I saw, a description of

24      a fixed indemnity plan, it just said a dollar amount and it

25      didn't say, you pay this or the plan pays this.  It was just

1       a dollar amount.

2   Q   Okay.  So if it says the plan pays this, then that's a little

3       bit more clear, you would agree with that; right?

4   A   I -- and in full transparency, I would say, and whatever else

5       is charged is your obligation.

6   Q   Okay.  All right.  And so limited benefit plans can cover

7       part of hospitalizations; is that right?

8   A   They are -- they will provide a fixed amount of money for a

9       hospital stay.

10   Q   Okay.

11   A   A day in the hospital.

12   Q   That's a yes; right?  Okay.  Doctor's appointments?

13   A   Yes.

14   Q   Okay.  Prescriptions?

15   A   They may.

16   Q   Okay.  And they're also set up to provide discounts to the

17       consumer as well; is that right?

18   A   I mean, they don't have to follow any of the rules we talked

19       about, so all of this would be at the discretion of the

20       insurer, what they want to cover and in what way.

21   Q   And again, would all be listed out in the summary of benefits

22       if in fact they got one; correct?

23   A   I'm just confused by this.  Are we --

24   Q   You don't --

25   A   Summary of benefits and coverage is a very specific thing.

 1        Different from just whatever materials an -- you know, a

 2        fixed indemnity plan chooses to share and what information

 3        they include and how they present it.

 4   Q    I agree.

 5   A    That is very different from -- I can go to the summary of

 6        benefits and coverage for my employer plan every year, it is

 7        the same format, I can look at the same document for the

 8        different three different plans I'm offered and compare them

 9        side by side.  We're talking about a different document.

10   Q    Exactly right.  With totally different --

11   A    It would be hard for me -- other than the one I saw in the

12        last year, it would be hard for me to speak to the

13        information that is shared.

14   Q    Okay.  Major medical is totally different we've already

15        established that.  I'm just talking about knowledge provided

16        to the consumer.

17                  THE COURT:  I think we -- I think I'm going to

18        break this loggerhead.  You guys are talking about two different

19        things.  The jury understands the point you're trying to make.

20        We understand the point you're trying to make.  They also

21        understand that you guys are talking across each other and not

22        to each other.  So why don't we move on to the next area of

23        inquiry.

24                  MR. RADEFELD:  Okay.

25

1    BY MR. RADEFELD:

2    Q    Were you aware of a survey conducted in September of this

3         year by the American Council of Life Insurers and Blue

4         Cross/Blue Shield Association where it stated that nearly

5         8.2 million people in the United States currently have

6         limited benefit plans?

7    A    I'm not aware of that specific -- you mean last September?

8    Q    Yeah.

9    A    I'm not aware of that survey.

10   Q    Okay.  But you would agree with me that there are millions of

11        people in the United States who have limited benefit plans?

12   A    Yes.  I'm aware that the Federal Government requested comment

13        on proposed changes to fixed indemnity plans.  Many insurance

14        companies, insurance regulators, and employers said they have

15        a role to play as supplemental coverage.  So that might have

16        been part of those comments on that federal proposed change.

17   Q    I wasn't asking about that.  I was just saying, there are

18        millions of people in the limited benefit plans; right?

19   A    They may be using them as supplemental coverage, yes.

20   Q    You don't know what they're using it for?

21   A    I don't know.  I mean, I'd have to see the specific survey.

22        If you have more information about it, that would...

23   Q    Now do you know which company or provider has the largest

24        group of limited indemnity plans in the United States?

25   A    No.

1  Q   You ever heard of Mediplan before?

2  A   No.

3  Q   Are you aware that Blue Cross/Blue Shield, Aetna, United

4      Health, and other A-rated providers carry indemnity products

5      as well?

6  A   I'm not sure what you mean by A-rated.

7  Q   Are you familiar with that term?

8  A   Not in the context of insurance companies, no.

9  Q   Okay.  All right.  So you've never heard like State Farm is a

10     triple A-rated insurance firm, nothing like that?  No?  Okay.

11             Just going to try and go through these real

12     fast.  We've talked a lot about them.  And so if a consumer

13     who had purchased -- I know when you gave your -- some of

14     your opinions yesterday, and you talked about individuals

15     having knowledge before they purchased a plan, do you

16     remember those opinions?

17 A   Mm-hmm.

18 Q   Okay.  And if a person were to receive -- or if the insurer

19     were to go above and beyond and provide their consumer who

20     had just purchased a limited benefit policy with a summary of

21     benefits and would have 30 days to cancel thereafter, in a

22     timeframe in which they could review the policy and what

23     it -- what the benefits were, you would agree with me that

24     they're receiving the information that you had given your

25     opinion on yesterday?

1  A   In our research and our work with patient and consumer

2      groups, it is often the case of an individual does not learn

3      about the limits of their policy until they have a big health

4      care cost that is not covered by it.  They -- if they don't

5      happen to get care in that first 30 days and really test it

6      out, understand the limits, they might not know -- they are

7      not likely to understand the limits.  It typically is not

8      known until they present at the hospital for care and they

9      get a bill that they were not expecting.

10 Q   Even though they're provided with it in black and white as to

11     what it covers?

12 A   Again, I can't speak to the disclosure.  I mean, I --

13 Q   Okay.  Fair enough.  And you would agree that there is a --

14     there is a market for limited benefit plans and consumers who

15     desire it; correct?  Especially back in 2014 to 2018?

16 A   I'm not aware of consumers saying, I really want a limited

17     benefit plan instead of something else.  I know that

18     employers and insurance regulators believe they have an

19     important role to play in supplementing other comprehensive

20     coverage.

21 Q   And you don't know because you didn't review, but you don't

22     know how many consumers at Simple Health had sold policies to

23     how many of them were pleased with the product that they

24     received?

25 A   Nope.

| | | |
|---|---|---|
| 1 | Q | Okay.  And you have no idea of the thousands of policies sold |
| 2 | | in Illinois, if we're only hearing about a very small |
| 3 | | percentage of them?  Do you know? |
| 4 | A | No. |
| 5 | Q | No?  Okay. |
| 6 | A | We do know from our research that often when consumers have |
| 7 | | issues with their insurance, they typically don't know where |
| 8 | | to go to make a report of a problem.  So whenever we talk to |
| 9 | | insurance departments about complaints they're getting about |
| 10 | | anything, we basically assume and they tell us that one |
| 11 | | complaint can represent a hundred, because there are many |
| 12 | | more people who probably experience the same problem and |
| 13 | | didn't know where to call.  There was a survey once, |
| 14 | | 80 percent of people don't even know a Department of |
| 15 | | Insurance exists, let alone how to contact them and make a |
| 16 | | complaint.  So our rule of thumb that we've been, you know, |
| 17 | | told from insurance departments is, very few people make |
| 18 | | complaints, so if there are any complaints at all, it usually |
| 19 | | represents a much larger problem. |
| 20 | Q | Okay.  But then again, if they are provided with a customer |
| 21 | | service number or anywhere they can call to make a complaint, |
| 22 | | that would be kind of what you're talking about? |
| 23 | A | If I were advising -- when we advise consumers and when we |
| 24 | | put resources on our website and work with groups for where |
| 25 | | to go if you have a problem with your insurance policy, it is |

1       not the customer service department.  It is someone who has

2       the authority to make the insurance company correct the

3       wrong.  The insurance department, for example, in your state.

4   Q   Okay.  Even though a person was able to get on the internet

5       and find the insurance, you're saying that the individual's

6       unable to get on the internet and find someone to complain

7       to?

8   A   The insurance department, yes.  I mean, we make that

9       information available, but there was a survey once by

10     Consumers Union, 80 percent of people don't know where to go

11     with a complaint about their insurance.  And that would be

12     the state insurance department.

13              MR. RADEFELD:  Okay.  All right.  Thank you,

14     Judge.  Nothing further.

15                    CROSS-EXAMINATION

16 BY MR. SIMS:

17   Q   Good morning, Ms. Volk.

18   A   Good morning.

19   Q   I understand that, you know, in your prior history, you are a

20     lobbyist; right?

21   A   That's right.

22   Q   And you were a lobbyist for consumers; right?  You were

23     trying to get laws passed for the benefit of consumers?

24   A   Yes.

25   Q   Now isn't it also true that the insurance companies have

1  lobbyists?

2  A   Yes.

3  Q   And the insurance companies' lobbyists are doing what would

4      be a little bit I guess at odds with you?  They're trying to

5      get laws passed that benefit the insurance companies;

6      correct?

7  A   I mean, that's their -- that is their job.  I will say that

8      it is often the case that interests align or do not conflict.

9      So for example --

10 Q   Sometimes they align, sometimes they conflict?

11 A   Yes.

12 Q   Okay.  Let's go to these limited benefit plans that we're

13     here about today.

14 A   Mm-hmm.

15 Q   Okay.  These plans were created by who?

16 A   I don't know.

17 Q   The insurance companies; right?

18 A   Yes.

19 Q   And for some reason, the lobbyists or whoever influence

20     Congress to say that we're not going to put these under the

21     federal regulations; correct?

22 A   Yeah.  I honestly don't know the origin of them and how, you

23     know -- what instigated them being recognized in law the way

24     they are.  I mean, another important stakeholder is benefit

25     advisors.  And as I said, employers believe that they have

|    |   |                                                                      |
|----|---|----------------------------------------------------------------------|
| 1  |   | great value as a supplemental benefit.  And so it could have        |
| 2  |   | been any number of stakeholders that lobbied for --                 |
| 3  | Q | But someone did; right?                                             |
| 4  | A | Someone did, I presume.                                            |
| 5  | Q | As a matter of fact, it became a law that they're not              |
| 6  |   | regulated; right?                                                  |
| 7  | A | They are regulated in a different way.                            |
| 8  | Q | They're not regulated in the Federal Government as insurance?     |
| 9  | A | Correct.                                                          |
| 10 | Q | Now when you were talking about surprise billing and you were     |
| 11 |   | saying that insurance had to give a summary of benefits and       |
| 12 |   | you had -- the people lobbied because -- to change this           |
| 13 |   | regulation or this law because people were getting balance        |
| 14 |   | billed, and it was a surprise, and they were going into           |
| 15 |   | financial ruin because they had no choice, when you're on the     |
| 16 |   | operating table and the doctor is in network, but then the        |
| 17 |   | anesthesiologist calls in sick that day and they bring in         |
| 18 |   | another anesthesiologist, because they're not going to cancel     |
| 19 |   | that operation, are they?                                         |
| 20 | A | No.                                                              |
| 21 | Q | They're going to bring in another anesthesiologist and he may     |
| 22 |   | not be in network?                                               |
| 23 | A | Correct.                                                          |
| 24 | Q | And now all of a sudden now, you've got this bill that your       |
| 25 |   | insurance company by law didn't have to -- doesn't have to        |

| | | |
|---|---|---|
| 1 | | pay, so they don't because it's not cost effective; correct? |
| 2 | A | No, actually, I mean, under the federal law, and I should be |
| 3 | | clear, it applies to insurance, not limited benefit plans, |
| 4 | | but insurance and employer plans, if that happens, if in the |
| 5 | | specific circumstances included in the federal law including |
| 6 | | emergency services and care at an in-network facility like |
| 7 | | surgery, then the insurance company still owes the |
| 8 | | out-of-network provider a payment and the individual is |
| 9 | | protected and they only pay what they would pay if everyone |
| 10 | | was in network. |
| 11 | Q | That was -- that's now? |
| 12 | A | That's the No Surprises Act. |
| 13 | Q | That's what I'm saying. |
| 14 | A | Protecting for surprise -- |
| 15 | Q | But back before the No Surprise Act, you had surprise |
| 16 | | billing; isn't that correct? |
| 17 | A | Yes. |
| 18 | Q | Because the consumer didn't have any choice as to what went |
| 19 | | on and all of a sudden now, he's getting an anesthesiologist |
| 20 | | bill that's out of network and it's hundreds or -- a hundred |
| 21 | | thousand or $85,000? |
| 22 | A | Right. |
| 23 | Q | Now you were saying that insurance are required to give you a |
| 24 | | summary of benefits; right? |
| 25 | A | I mean, the term in law, summary of benefits and coverage, |

| | | |
|---|---|---|
| 1 | | it's a very specific document. |
| 2 | Q | That's what I'm saying.  They're required to give -- they're |
| 3 | | insurance.  Are they required to verbally tell them? |
| 4 | A | Not a summary of benefits and coverage, no. |
| 5 | Q | So as long as they put it in writing on a document and hand |
| 6 | | it to or submit it to the consumer in any form or fashion |
| 7 | | like e-mail or mail, then they are in compliance? |
| 8 | A | Yes.  I will say, some short-term plans and fixed indemnity, |
| 9 | | again, are a different category, and some states, because of |
| 10 | | the confusion that often comes up with them, require a verbal |
| 11 | | disclosure. |
| 12 | | THE COURT:  Ma'am, you answered his question. |
| 13 | | You have a tendency of going way beyond the question that's |
| 14 | | asked.  You answered his question.  Next question. |
| 15 | | THE WITNESS:  Okay. |
| 16 | | MR. SIMS:  Thank you, Your Honor. |
| 17 | BY MR. SIMS: |
| 18 | Q | Are you aware of the company called AM Best Rating? |
| 19 | A | I mean, I've seen it online.  I don't really -- I'm not |
| 20 | | familiar with what it is. |
| 21 | Q | So you're not aware that they rate insurance companies? |
| 22 | | That's where you get the A rating? |
| 23 | A | No. |
| 24 | Q | Okay.  But you are an expert in insurance? |
| 25 | A | I'm not aware of rating insurance.  There's quality ratings |

1   for insurance companies.  You know, I don't know what they

2   capture in their ratings.

3 Q Did you get a chance to review the scripts that were -- that

4   were being used in this case?

5 A No.

6 Q So you can't give an opinion on those scripts then, can you?

7 A Not about the specific scripts, no.

8       MR. SIMS:  Nothing further at this time, Your

9   Honor.

10      THE COURT:  Redirect?

11       REDIRECT EXAMINATION

12 BY MR. VERSEMAN:

13 Q Ms. Volk, Mr. Sims asked you if you had reviewed the scripts

14   in this case, and I believe you indicated you haven't looked

15   at the specific scripts here?

16 A Right.

17 Q If a script for a limited indemnity plan stated, the whole

18   idea of this plan is to make your out-of-pocket expenses as

19   low as possible, would you have an opinion as to whether that

20   was misleading?

21 A I would consider that misleading.

22 Q Why?

23 A Because the whole point of the policy is to pay out a fixed

24   amount, regardless of the cost of the care.

25 Q If a script for a limited indemnity plan stated, after all's

1    said and done, you'll end up owing pennies on the dollar,

2    would you consider that misleading?

3  A   Again, I would consider that misleading because it would only

4    pay a fixed amount regardless of the cost of care, and what

5    would adjust is what the individual pays out of pocket.  I

6    don't know how they could say it would be pennies on the

7    dollar.

8  Q   Okay.  Mr. Radefeld was asking you about affordability for

9    ACA plans in the 2016 and 2018 time period.  I just wanted to

10    clarify, did you testify that during that time period,

11    subsidies were available for people to get an ACA-compliant

12    plan, major medical, if they were making up to four times the

13    poverty level?

14  A   That's right.

15  Q   And I think you said something about a professional code of

16    conduct.  That's a code of conduct for who?

17  A   For brokers and agents.  Sometimes they're called producers.

18    They have different names under state law.  They're specific

19    obligations to be licensed by the state to sell insurance.

20  Q   Okay.  And did you say that under that brokers' code of

21    conduct, there was a requirement that they make folks aware

22    of those subsidies?

23  A   They are not obligated to tell people about subsidies.  They

24    are obligated to fully disclose how a plan would work and

25    whether or not it is suitable for the individual based on

| | | |
|---|---|---|
| 1 | | their health care needs. |
| 2 | Q | Okay.  Mr. Radefeld was asking you about short-term plans and |
| 3 | | the Trump administration promoting those.  Short-term plans, |
| 4 | | are those the same thing as limited indemnity? |
| 5 | A | No, they're actually in a third category.  You know, there's |
| 6 | | insurance, there's short-term plans, and accepted benefits. |
| 7 | | People do buy them as a policy on their own. |
| 8 | Q | Okay.  So the Trump administration promoting these short-term |
| 9 | | plans doesn't mean that they were promoting these limited |
| 10 | | indemnity plans? |
| 11 | A | Correct. |
| 12 | Q | Okay.  Just wanted to clarify.  And Mr. Radefeld asked you if |
| 13 | | providing a summary of benefit on a limited indemnity plan |
| 14 | | was going above and beyond.  Do you recall that? |
| 15 | A | Yes. |
| 16 | Q | Is it your opinion that that is something that should be |
| 17 | | provided? |
| 18 | A | Yes.  I mean, I am having trouble understanding how a limited |
| 19 | | benefit plan would complete that, because of the required |
| 20 | | wording, if you get this care, you will pay this amount. |
| 21 | | That's impossible to explain with a policy that pays out a |
| 22 | | fixed amount and what you will pay will vary. |
| 23 | Q | And when -- in your opinion, when should the summary of |
| 24 | | benefits be provided? |
| 25 | A | Before someone enrolls. |

1   Q   Why?

2   A   Because before you buy something, you should fully understand

3       what you're buying.

4   Q   And you've done some research into these limited indemnity

5       plans and how they're marketed; correct?

6   A   Yes.

7   Q   And have you seen situations where the summary of benefits is

8       not provided upfront?

9   A   Yes.  We did some research last year, actually where we made

10      some of our own calls as if we were someone looking for

11      insurance, Google, Obamacare, cheap insurance, see what

12      happens.  Flood it with calls.  And the script, our research

13      script, because we were asking the same questions of every

14      person that tried to sell us something, included, can I

15      please see the summary or some explanation of the benefits

16      before I enroll, and only one call out of 20 did someone

17      provide something, and that is the document I was referring

18      to.

19  Q   Can that lead to a consumer being misled if they're not

20      provided with that summary of benefits before they purchase?

21  A   Yes.  I mean, it's incomplete information.

22  Q   And you said after they purchase -- if they're not provided

23      with that summary of benefits upfront, a lot of consumers

24      don't find out until they have to go to the hospital what

25      they're actually covered for?

1    A    Right, what the limits will actually be, until you use it and

2         need it.

3    Q    And Mr. Radefeld asked you if you were aware of some study

4         saying that 8.2 million Americans have these fixed indemnity

5         plans.  You recall the question?

6    A    Yes.

7    Q    And did you indicate that you're not aware of that particular

8         study?

9    A    I am not.  But the timeframe makes me think it was offered in

10        response to the Federal Government asking for comment on

11        fixed indemnity plans.

12   Q    And did you testify earlier that these fixed indemnity plans

13        are actually designed to be supplements?

14   A    Yes.  Historically, as income replacement.  So when you -- at

15        a time in your life when you're sick and potentially not able

16        to work full-time, so your income is reduced and your costs

17        have gone up, it's a way to bring in extra come to help to

18        fray those costs.  But it is not specifically coordinated

19        with your insurance to, for example, pay your deductible for

20        you.

21   Q    And it's designed to be a supplement for what?

22   A    Comprehensive plan.

23   Q    Okay.  If somebody doesn't have a comprehensive plan, they're

24        basically left to unlimited medical expense exposure; isn't

25        that right?

1    A    That's correct, yes.

2                    MR. VERSEMAN:   Judge, I believe that's all I

3         have.  Thank you.

4                         RECROSS-EXAMINATION

5    BY MR. RADEFELD:

6    Q    The prosecutor just asked you about if a script had said,

7         make your out-of-pocket expenses as low as possible, do you

8         recall that?

9    A    Mm-hmm.

10   Q    Okay.  But the complete statement that he was referring to,

11        the idea is to make your out-of-pocket expenses as low as

12        possible without you having to meet any deductible first;

13        isn't that -- does that change your opinion as to whether or

14        not that that's still misleading?

15   A    No.  I would still consider that misleading because I know

16        that these products only pay out a fixed amount.  I mean,

17        there's no deductible because they're just going to pay per

18        service, you know, based on a fixed amount.  They're not

19        going to pay according to the costs that you actually have.

20   Q    So if we had heard from an individual who actually ended up

21        paying less money by having the limited benefit plan versus

22        having a major medical plan where she had to pay a very high

23        deductible, I mean, how -- you would agree with me that

24        that's not misleading, that's an accurate statement, is it

25        not?

1   A   The principal difference that I think consumers should be

2       aware of before buying a plan is that even with a high

3       deductible, at some point, under an insurance policy that has

4       to have an out-of-pocket limit, you will hit that limit.  I

5       mean, for very sick people who have a big hospital bill, they

6       will hit that limit.  That is not the case with a fixed

7       indemnity plan.

8   Q   So a person who is very sick, goes to the hospital a lot or

9       goes to the doctor a lot or has other medical needs, probably

10      the limited benefit plan would not be right for them; is that

11      right?

12  A   That's right.

13  Q   Okay.  And so did you know that Simple Health sold short-term

14      medical as well as limited benefit plans as well?

15  A   No, I didn't know that.

16  Q   Okay.  And this research that you had said where you and

17      other individuals would call, you would have a script and

18      pretend you're buying a plan --

19  A   Shopping for a plan, yes.

20  Q   Shopping for a plan.  Okay.  Did you ever call Simple Health?

21  A   I didn't call anyone directly.  I used Google to say I was

22      looking for insurance and then was flooded with phone calls.

23  Q   All right.  Do you know if you worked with anybody with

24      Health Benefits One or Simple Health?

25  A   I do not know.  I do not.

1      MR. RADEFELD:  I have nothing further, Judge,

2    thank you.

3                    RECROSS-EXAMINATION

4  BY MR. SIMS:

5  Q    I'm confused.  You said that something was misleading.  Even

6    if it's true, it's misleading?

7  A    I'm sorry, which statement specifically?

8  Q    You said -- okay.  Where they made the statement about the

9    purpose or the whole idea behind the plan is to make your

10    out-of-pocket expenses as low as possible without having to

11    pay this high deductible, you said that was misleading.  How

12    is that misleading if it's true?

13  A    Because it omits the critical piece of information --

14  Q    See, you're saying this is critical.  Now if -- and you're

15    talking about a person who's sick who's going to eventually

16    meet that $3,000 deductible.  But what if I'm a healthy

17    individual?  I'm only going to go to the doctor on average

18    twice a year.  How am I going to reach that $3,000

19    deductible?

20  A    Healthy individuals -- the challenge with health is you don't

21    know what's coming down the pike.

22  Q    I understand that.

23  A    There could be a diagnosis.  There could be a bus that hits

24    you.

25  Q    Or there could not be.

1  A    If you're willing to roll the dice, if you have full

2       information that there is nothing that's going to protect you

3       in the event that you're hit by a bus and you go to the

4       hospital for two weeks and you incur half a million dollars

5       in expenses, but we're only going to pay out a hundred

6       dollars for each day, and I'm willing to put my house on the

7       line, that is a different sales conversation.

8  Q    And if I'm willing to do that, then that's my right; correct?

9  A    But that assumes full information, not leaving out critical

10      information like, this is not intended to be a -- this is

11      intended to be a supplement and we will not cap your

12      expenses.

13 Q    I like the way you don't want to answer questions, but I'mma

14      ask the question again.

15                  MR. VERSEMAN:  Judge, I'm going to object again.

16                  THE COURT:  No, he's correct.  The question was,

17      it's my right -- that would be my right to do it, and she could

18      have said yes, she could have said no, but she injected far more

19      information.

20 BY MR. SIMS:

21 Q    So I'm going to try it like this --

22                  THE COURT:  Nobody's moved to strike any of these

23      answers --

24 BY MR. SIMS:

25 Q    I'm going to do this.  It's yes or no.  Is it my right?  Yes

```
 1      or no?
 2   A  It is presently your right.  You have no obligation to have
 3      insurance -- well, you have an obligation to have
 4      comprehensive insurance, but there's no penalty for not
 5      having it.
 6   Q  So that is yes, it's my right?
 7   A  If I have to choose yes or no, but --
 8   Q  Yeah, that's what you got to choose.
 9   A  It is your right, yes, of course, to buy whatever you want.
10   Q  Thank you.  Now I'm going to give you an example.  Doctor
11      charges me $200 per visit.  I get one of these plans where
12      because I got the plan, I get a rate, a discounted rate for
13      my doctor's visit.  It goes down from 200 to 75.  I also get
14      a payment for my plan for doctor visits of $50.  So now my
15      total for that $200 visit is $25.  Is that a good thing or a
16      bad thing?  Yes or no.
17   A  No.  It's not insurance.
18   Q  I didn't ask you if it was insurance.  I asked you simply,
19      was it a good thing or a bad thing that my $200 bill went
20      down to $25?
21   A  No.
22   Q  Who regulates these plans, the Federal Government or the
23      state?
24                  THE COURT:  You say plans, we're talking --
25
```

```
1    BY MR. SIMS:

2    Q    We're talking about these limited benefit plans.

3    A    They're regulated under both state and federal law.

4    Q    I thought you just said that the Federal Government didn't

5         even consider them insurance and they weren't regulated?

6    A    As insurance.

7    Q    As insurance.

8    A    Yes.  But they -- I mean, there are states that have their

9         own requirements.  Some have disclosure requirements.

10   Q    I said regulate.

11   A    So insurance, the primary responsibility for insurance is at

12        the state level under a federal law known as

13        McCarran-Ferguson, but the Federal Government can set a floor

14        for protections.  That's the conversation we had yesterday.

15                   MR. SIMS:  Was Exhibit -- Government's

16        Exhibit 23, was that admitted into evidence?

17                   THE COURTROOM DEPUTY:  23?

18                   MR. SIMS:  Yes.

19                   THE COURTROOM DEPUTY:  Yes.

20                   MR. SIMS:  Could you pull up federal -- the

21        Government's Exhibit 23 and go to page 21.

22   BY MR. SIMS:

23   Q    Certificate of insurance.  But this is in bold letters down

24        at the bottom of it, it says, this is a limited benefit

25        coverage.  A preexisting condition limitation may apply.
```

| | | |
|---|---|---|
| 1 | | This is not Medicare supplement coverage.  Please read this |
| 2 | | certificate carefully.  But right here, it says certificate |
| 3 | | of insurance? |
| 4 | A | I'm sorry, where does it say certificate of insurance?  This |
| 5 | | limited benefit coverage... |
| 6 | Q | Top, first paragraph, bold capital letters, certificate of |
| 7 | | insurance. |
| 8 | A | Okay.  But it is not insurance. |
| 9 | Q | But it's not insurance according to you? |
| 10 | A | Not under the definition of what complies with -- |
| 11 | Q | So these people should be brought up on charges? |
| 12 | A | It is not the insurance that we are talking about that is |
| 13 | | subject to -- |
| 14 | Q | I'm just an ordinary person.  I'm just the consumer.  If |
| 15 | | something says certificate of insurance, I'm not an expert |
| 16 | | like you, I believe I have insurance. |
| 17 | | MR. SIMS:  Nothing further. |
| 18 | | THE COURT:  Any redirect? |
| 19 | | MR. VERSEMAN:  No, Your Honor. |
| 20 | | THE COURT:  All right.  Let's take a five-minute |
| 21 | | recess.  Any reason to keep this witness? |
| 22 | | MR. VERSEMAN:  No, Your Honor.  Can she be |
| 23 | | excused? |
| 24 | | THE COURT:  Thank you, ma'am. |
| 25 | | (Jury exits at 10:14 a.m.) |

```
 1                         (Recess at 10:14 a.m.)

 2                         (Return at 10:23 a.m.)

 3                         (Jury enters at 10:23 a.m.)

 4                         THE COURT:  Please be seated.  Thank you.

 5                         Call your next witness.

 6                         MR. VERSEMAN:  Yes.  United States calls Katrina

 7      Ruth.

 8                         THE COURTROOM DEPUTY:  Please raise your right

 9      hand.  Do you swear that the testimony you're about to give

10      before this Court will be the whole truth and nothing but the

11      truth?

12                         THE WITNESS:  Yes.

13                         THE COURTROOM DEPUTY:  Please state your full

14      name and spell your last name for the Court.

15                         THE WITNESS:  Katrina Ruth, R-u-t-h.

16                         THE COURTROOM DEPUTY:  Thank you.

17                              DIRECT EXAMINATION

18      BY MR. VERSEMAN:

19      Q    Good morning, Ms. Ruth.

20      A    Good morning.

21      Q    Can you tell us what city and state you live in?

22      A    Cleveland, Ohio.

23      Q    Okay.  And is that where you're originally from?

24      A    Yes.

25      Q    Can you tell us how far you went in school, ma'am?
```

1  A    Some college.

2  Q    Some college.  Where'd you go?

3  A    Ohio University.

4  Q    Okay.  And what do you do for a living?

5  A    Still an insurance agent.

6  Q    Okay.  You're an insurance agent in Cleveland?

7  A    Yes.

8  Q    And do you have a license to sell health insurance?

9  A    Yes.

10  Q    When did you get your license to sell health insurance?

11  A    2014.

12  Q    2014?

13  A    Yes.

14  Q    Okay.  And have you always lived in Cleveland?

15  A    No.

16  Q    Where else have you lived?

17  A    Florida.

18  Q    I'm going to ask you, pull that microphone just a little bit

19       closer so we can hear you.

20  A    Florida.  That's way better.

21  Q    Way better.  Yes.  Okay.  And when did you move down to

22       Florida?

23  A    In 2012 or '13.  2013.

24  Q    Okay.  Why'd you go down to Florida?

25  A    Because I was young and living life.

1   Q    Thought it'd be fun to go down to Florida?

2   A    Yeah.

3   Q    Okay.  So take it you had to get a job when you got down

4        there?

5   A    Yes.  I transferred to a different Subway.  I worked at

6        Subway in Cleveland.  I just transferred to one in Florida.

7   Q    Okay.  And just so we're clear, are you talking about the

8        Subway restaurants with the sandwiches that we all know?

9   A    Correct.

10  Q    Okay.  You had been working at Subway in Cleveland, got a job

11       at Subway down in Florida?

12  A    Yep.

13  Q    Okay.  So how long did you stay working at Subway?

14  A    Not long at all.  Like maybe three or four months.

15  Q    Okay.  Have you heard of a business called Health Benefits

16       Center?

17  A    At that time?  No.

18  Q    Okay.  At some point, did you hear of a business called

19       Health Benefits Center?

20  A    Yes.

21  Q    And how'd you hear about that?

22  A    A few people that used to come into my Subway worked there.

23  Q    Okay.  And can you tell us -- this Subway, where was it

24       located?  Do you remember the street?

25  A    You really messing with my memory today.  North Park Road I

| | | |
|---|---|---|
| 1 | | believe. |
| 2 | Q | Okay.  Park Road.  All right.  So you said some people that |
| 3 | | worked at Health Benefits Center used to come into your |
| 4 | | Subway.  Do you remember who they were? |
| 5 | A | Yes.  Victor, Diana, John, and a couple of other people. |
| 6 | Q | And do you know John's last name? |
| 7 | A | Sands. |
| 8 | Q | And did you end up working with John Sand for a while? |
| 9 | A | Yes. |
| 10 | Q | Would you recognize him if you saw him again? |
| 11 | A | Yes. |
| 12 | Q | Can you tell us if he's in the courtroom today? |
| 13 | A | Yes, he's right there. |
| 14 | Q | Okay.  Tell us what he's wearing. |
| 15 | A | I don't know, a black suit. |
| 16 | | MR. VERSEMAN:  Okay.  Your Honor, may the record |
| 17 | | reflect the in-court identification of John Sand. |
| 18 | | THE COURT:  So noted. |
| 19 | BY MR. VERSEMAN: |
| 20 | Q | Okay.  So did you ever go to work for Health Benefits Center? |
| 21 | A | Yes, I did. |
| 22 | Q | All right.  How did that come about? |
| 23 | A | They basically recruited me from Subway. |
| 24 | Q | They recruited you? |
| 25 | A | Yeah. |

1   Q   How'd that come about?

2   A   They just liked my attitude and my personality and just told

3       me I would do well over there, so they recruited me over

4       there to have an interview.

5   Q   And who's they?  Who asked you for an interview?

6   A   It was Victor.

7   Q   Victor.

8   A   He was the head of the HR.

9   Q   Head of HR.  Okay.  What about John Sand?  Did you get to

10      know him a little bit when he was one of the customers over

11      at Subway?

12  A   Yeah.  We are both originally from Cleveland, Ohio, so we

13      used to joke about like the football teams and stuff like

14      that.

15  Q   Okay.  Joke about the Browns?

16  A   Yeah, for sure.  Nice joke this time around too.

17  Q   Okay.  Did you go in for an interview at Health Benefits

18      Center?

19  A   Yes.

20  Q   Who'd you interview with?

21  A   Cam Girouard.

22  Q   Okay.  And what position were you interviewing for?  Do you

23      remember?

24  A   At that time, I wasn't interviewing for a specific position.

25      They were just going to put me where I fit.

1  Q  Okay.  And did you -- you got hired?

2  A  Yes.

3  Q  Okay.  And you said they put you where you fit.  Where did

4     they end up putting you?

5  A  Initially in customer service.

6  Q  Okay.  And as customer service agent, were you paid by the

7     hour, were you paid like a salary, were you paid on

8     commission?  How'd you get paid?

9  A  By the hour.

10  Q  Okay.  Tell us about -- did you get any training to be a

11     customer service agent?

12  A  Yes, I had I guess what you would call a training.

13  Q  All right.  Well, tell us what it was.

14  A  I had a couple days where I had to sit on the sales floor and

15     listen to the agents on the sales floor sell, and then I had

16     a couple of days where I had to sit with the customer service

17     agents so I could hear how they handle customer service

18     calls.

19  Q  Did they have you shadowing a particular person in sales?

20  A  In sales, I shadowed Lauren.  I don't know her last name.  So

21     please --

22  Q  Did you say Warren?

23  A  Lauren.

24  Q  Lauren.  Okay.  And who did you -- did you shadow somebody in

25     customer service?

1    A    Her name was -- what was her name, Cathy?

2    Q    Been a long time?

3    A    Yes.

4    Q    Okay.  And so when you were in customer service --

5    A    Carol.  Sorry, I remembered.  It's Carol.

6    Q    Carol.  Okay.  And so in customer service, were you able to

7         hear both sides of Carol's calls with the customers, or were

8         you just hearing Carol's side?

9    A    Only heard Carol.  I couldn't hear the customers.

10   Q    Okay.  So from listening to Carol on the phone with

11        customers, did you learn what she was trying to do?  What was

12        the point of this?

13   A    The point was to try to avoid them canceling the policy.

14   Q    Okay.

15   A    And she explained benefits too.

16   Q    Okay.  But the main duty was to keep people from canceling?

17   A    Yeah.

18   Q    All right.  So after you became a customer service agent,

19        what percentage of your time would you say was spent trying

20        to prevent people from canceling?

21   A    Like 70 percent.

22   Q    70 percent?

23   A    Mm-hmm.

24   Q    Okay.  The other percent was spent doing what?

25   A    Like explaining benefits, walking them through like finding a

1  prescription that they may need, or, you know, walking them

2  through the process and assisting them on whatever they

3  needed.

4  Q  And so the facility you were in when you started you said was

5  on Park Road?

6  A  Yeah, that was off of North Park Road and Hollywood

7  Boulevard.

8  Q  And I want you to just kind of set the scene for us a little

9  bit.  At that time, did Health Benefits Center have more than

10  one location or just that location there on Park?

11  A  Just one location.

12  Q  So was everybody in the same space?  I mean, the sales and

13  customer service, were they all together?

14  A  We're in the same building, but we had different sections of

15  the building.

16  Q  Okay.  Tell us about customer service.  Where were you guys

17  located?

18  A  We were on the left side of the building.  No sales agents

19  can come over there.  They would have to have like a key code

20  to come over there.

21  Q  Okay.  And so did you guys have your own room?

22  A  Yeah, we had our own individual room at that time.

23  Q  Was it a big room, small room?

24  A  Super tiny.

25  Q  Super tiny.

| | | |
|---|---|---|
| 1 | A | It was only like maybe six of us at that time.  I started |
| 2 | | when they were pretty small. |
| 3 | Q | There was six of you in that room? |
| 4 | A | Mm-hmm. |
| 5 | Q | And who was the supervisor of customer service at that time? |
| 6 | A | Cam Girouard. |
| 7 | Q | Was she in that room with you? |
| 8 | A | Yes. |
| 9 | Q | And what -- and the other customer service agents were in |
| 10 | | that room too? |
| 11 | A | Yes. |
| 12 | Q | So how many were there of you, four or five or so? |
| 13 | A | Yes. |
| 14 | Q | Okay.  Do you know -- you said the sales agents were in the |
| 15 | | same building; right? |
| 16 | A | Yes. |
| 17 | Q | About how many sales agents were there at that time, if you |
| 18 | | recall? |
| 19 | A | At that time, like I would say ten to 20. |
| 20 | Q | Okay. |
| 21 | A | But not that many. |
| 22 | Q | Not that many? |
| 23 | A | Mm-mm. |
| 24 | Q | All right.  Do you know a person named Steve Dorfman? |
| 25 | A | Yes. |

| | | |
|---|---|---|
| 1 | Q | When did you meet him? |
| 2 | A | He was a CEO, so you would meet him, but you like didn't meet |
| 3 | | him, though, if that makes sense. |
| 4 | Q | So you didn't really have a lot of interactions with him? |
| 5 | A | Correct. |
| 6 | Q | You knew who he was because you said he was the CEO? |
| 7 | A | That's what I thought, the owner of the company. |
| 8 | Q | And the owner of the company? |
| 9 | A | Hmm? |
| 10 | Q | You said CEO and owner of the company? |
| 11 | A | I thought that was the same thing, but yes. |
| 12 | Q | All right.  Would you recognize him if you saw him again? |
| 13 | A | Yes. |
| 14 | Q | Is he present in the courtroom? |
| 15 | A | Yes. |
| 16 | Q | Can you tell us where he's seated and what he's wearing? |
| 17 | A | He's right there and he has on a black suit. |
| 18 | Q | Black suit.  Okay. |
| 19 | | MR. VERSEMAN:  Your Honor, may the record reflect |
| 20 | | the in-court identification of the defendant Steve Dorfman. |
| 21 | | THE COURT:  So noted. |
| 22 | BY MR. VERSEMAN: | |
| 23 | Q | Okay.  So on that Park Road facility, where was Mr. Dorfman's |
| 24 | | location in that space? |
| 25 | A | It was in our area.  Like the key card area that unlocked it, |

| | |
|---|---|
| 1 | he was in the same area.  He was just like two offices down |
| 2 | or three offices down. |
| 3 | Q   Okay.  And what about John Sand?  Where did he work from? |
| 4 | A   The sales floor. |
| 5 | Q   And your supervisor at that time you said was Cam Girouard? |
| 6 | A   Yes. |
| 7 | Q   And your primary job is preventing people from canceling? |
| 8 | A   And helping them. |
| 9 | Q   And helping them.  Did your supervisors keep track of how |
| 10 | many policies that you were able to prevent from being |
| 11 | canceled? |
| 12 | A   Yes. |
| 13 | Q   How did they keep track of that? |
| 14 | A   They used like an Excel sheet at that time. |
| 15 | Q   All right.  And was there pressure put on the customer |
| 16 | service agents to prevent as many policies as possible from |
| 17 | canceling? |
| 18 | A   Pressure?  No, it wasn't pressure.  That was our main goal at |
| 19 | the end of the day, but it wasn't no pressure.  Like if you |
| 20 | don't do this, you're fired, it was nothing like that.  But |
| 21 | if you wasn't good, you didn't last long. |
| 22 | Q   If you weren't good, you didn't last long.  What happened to |
| 23 | you if you weren't good? |
| 24 | A   You either got transferred to a different department or you |
| 25 | didn't last long because you wasn't good at your job so you |

1        get fired.

2    Q   You'd get fired?

3    A   Yeah.

4    Q   Approximately how many calls did you take per day as a

5        customer service agent?

6    A   That's a hard question.  I don't know.  Like 20 to 50 a day.

7    Q   20 to 50?

8    A   Some days were slow, some days were busy.

9    Q   And you're in the same room with the other customer service

10       agents; right?

11   A   Yes.

12   Q   So you could hear them on the phones?

13   A   Yes.

14   Q   Were they taking about the same number of calls, 20 to 50 a

15       day?

16   A   Yes.

17   Q   Okay.  So how many times per day were you talking to people

18       who wanted to cancel their policies?

19   A   I would say, what, 25, if we go to 50 a day.

20   Q   25 to 50 a day that wanted to cancel?

21   A   25, going by the fact that I spoke with 50 people a day.

22   Q   So half of them might be people that wanted to cancel?

23   A   Yes.

24   Q   And again, you're in the same room with the other customer

25       service agents.  Were they taking the same amount of calls

1      from people that wanted to cancel?

2  A  Yes.

3  Q  What were the common reasons people were giving you for

4      wanting to cancel their policies?

5  A  Their prescription wasn't covered with the plan, their doctor

6      didn't take the plan, the plan wasn't what they thought it

7      was.  The main one was no doctor would take it.  That was

8      like the number one.  Oh, and like if they received like a

9      bill in the mail when they thought it was going to be covered

10     and they would be like, I didn't know I was going to have to

11     pay for this.

12 Q  How often would that happen where somebody calls in and says,

13     I got a bill and I thought it was going to be covered?

14 A  I would say like 20 percent of the time.  Most people -- most

15     people, they were proactive prior to the bill.

16 Q  They were what?

17 A  Most people were proactive, like they took care of things

18     prior to receiving a bill, if that makes sense.  They didn't

19     wait -- they didn't wait to call in until after they received

20     the bill.  Most people read their policy and called in prior

21     to, if that makes sense.

22 Q  How do you know that?

23 A  Based off the call.  Because -- I say that because when you

24     receive a bill -- we didn't have that many people that had

25     the bill in front of them and was like, yeah, so I have this

1    bill in front of me.  You get what I'm saying?  You have more

2    people, like the doctor told them like, we are not taking

3    your plan, or like a proactive thing, like before they

4    actually received a service at the hospital, call in about

5    it.  Does that make better sense?

6  Q  Okay.  Did you get people calling in saying they thought that

7    their -- 70 percent of their medical bills were going to be

8    covered?

9  A  Yes.

10 Q  And how often did that happen?

11 A  A lot.

12 Q  A lot.  And how do you know what you were supposed to say to

13   these people when they called in with these different reasons

14   for why they wanted to cancel?

15 A  Oh, we had like a little rebuttal sheet in the customer

16   service department.

17 Q  All right.  And a rebuttal, what is a rebuttal?

18 A  A rebuttal is a response in regards to -- it's like an

19   argument when someone says one thing to you, you rebuttal

20   back so that you win that argument basically.

21 Q  And is this something that you came up with?

22 A  No.

23 Q  Provided to you as a customer service agent by your

24   supervisor?

25 A  Correct.

1   Q   Okay.  Did these rebuttals you gave, did they satisfy the

2       people, what they were calling in about?  Were you able to

3       prevent them from canceling with these rebuttals?

4   A   A lot of times, yeah.  But maybe not so well because I didn't

5       last in customer service that long, so, at that time.

6   Q   Okay.  So what happened on the other times when the people

7       weren't satisfied?

8   A   They would cancel their policy.

9   Q   And was there a rule you were supposed to follow about how

10      many times you were supposed to keep trying to get the people

11      from canceling their policies?

12  A   It's not -- it wasn't a specific rule, like rebuttal them

13      five times, and at that point, if they don't -- you know, it

14      wasn't like that.  You just knew on the call when you still

15      had a chance and you knew when you didn't.  It was kind of

16      like common sense.

17  Q   You said a lot of the calls you took were from people that

18      were complaining that their prescriptions weren't covered?

19  A   Yes.

20  Q   Was there a scripted rebuttal you were supposed to give for

21      that?

22  A   Yes.

23  Q   And do you remember what that was?  What were you supposed to

24      tell them?

25  A   Word for word, no, but in a sense of specifically, we would

1   let them know that they had a prescription discount card that

2   covered up to 80 percent off of their prescriptions.  If they

3   didn't -- if that prescription card didn't work that well, we

4   would direct them to what's called GoodRx, which is an online

5   service, and then we would walk them through like what's

6   called Prescription Help, another online service.

7 Q And this GoodRx, is that some sort of coupon that these

8   people could have gotten on their own?

9 A Yes.

10 Q What was the other thing you said?

11 A Prescription Help.

12 Q And what is that exactly?

13 A It's an income-based prescription assistance program where it

14   lowers like any of your brand name prescriptions down, so a

15   $50 co-pay or less.

16 Q Again, this is something people could have done on their own?

17 A Yes.

18 Q Without buying this policy?

19 A Correct.

20 Q And when you were in customer service, did you keep records

21   of the calls that would come in?

22 A What do you mean?

23 Q Were you required to take some sort of notes or put them into

24   a computer or something like that?

25 A Yes.

1  Q   Okay.  Do you remember what that recordkeeping system was
2      called?
3  A   No.
4  Q   Have you ever heard of Salesforce?
5  A   At that time, we was not using Salesforce yet.  We're going
6      in the timeline; right?  So I want to make sure I'm saying
7      the right thing.  Salesforce was not introduced yet.
8  Q   Okay.  At some point, Salesforce became the program that was
9      used to keep track of things?
10 A   Yes, I helped beta test it.
11 Q   All right.  Did you like working customer service?
12 A   No.
13 Q   Why not?
14 A   Me and Cam did not get along.
15 Q   Okay.  What about the calls that you were taking?  Did that
16     affect whether you liked working in customer service?
17 A   It was stressful.  I came from a world of -- I worked at
18     Subway.  So yes, it was very stressful.  And at that time, I
19     didn't have much knowledge about health insurance for real.
20     I wasn't a licensed agent at that time.
21 Q   Why was it stressful?
22 A   People calling and yelling at you, or like angry and now you
23     have to calm them down.  I wasn't used to that.
24 Q   How often would that happen, people would be calling in and
25     be angry and yelling at you?

1   A   The angry calls, that's like 20 percent of the calls.

2   Q   20 percent?

3   A   Anger, yeah.

4   Q   What about people crying?  Did you ever have people crying on

5       the phone?

6   A   Are you asking me in a timeline sense?

7   Q   In customer service.

8   A   When I worked in customer service at that time?  I didn't get

9       a crier.

10  Q   You said you left customer service.  Did you leave the

11      company at that time?

12  A   No.

13  Q   Did you go to a different department?

14  A   Yes.

15  Q   Which department did you go to?

16  A   Verification.

17  Q   All right.  And what is verification?

18  A   Once a sales agent sells a policy, then it's transferred over

19      to verification to read all the specifics, so then we can

20      charge the card and actually have the sale go through.  And

21      we do the application as well.

22  Q   You do the application there?

23  A   Yeah.

24  Q   Where was the verification department located?

25  A   Next to the sales floor.

1    Q    All right.  And how many verification agents were there?

2    A    Like eight, eight to ten.

3    Q    Okay.  And who was the supervisor over there?

4    A    David.  I don't remember his last name, which is crazy.

5    Q    Were there -- you said there were some scripted rebuttals you

6         had to follow in customer service.  What about with

7         verification?  Was there a script in verification?

8    A    Yes.

9    Q    And did you receive any training to be a verification agent?

10   A    Yeah.  I shadowed and listened, but mostly it was just

11        reading, so that didn't last.  It wasn't a long training.

12   Q    Okay.  And did you get -- were you given any instructions

13        about how you were supposed to read that verification script?

14   A    Clear and fast.

15   Q    Clear and fast?

16   A    Yes.

17   Q    Were you told why you were supposed to read it fast?

18   A    Because it wasn't -- because a lot of times, when you did not

19        move at a fast pace, then they would make a person who's

20        calling kick in the sale.

21   Q    What does kick mean?

22   A    That means they'll like -- they'll fight it.  Like in the

23        middle of it, they'll be like, no -- they'll say no,

24        basically.  So each part of a verification script, after the

25        little reading part, you say, do you understand?  And then

1    say yes.  A kick is when they say, no, I don't understand.

2  Q  So you were told to read the script fast so people won't kick

3    or fight the sale?

4  A  Yes.

5  Q  Okay.  And if they would kick or fight the sale, what were

6    you supposed to do?

7  A  At that point, we would transfer back over to the sales agent

8    at that time.

9  Q  Okay.  And were there any instructions about starting the

10    call over if you got any no's in response to the question?

11  A  We had to start over a verification if there was any

12    interruption, other than what we asked them specifically on

13    the call.

14  Q  So if you got any answer other than yes, you were supposed to

15    start over?

16  A  Yes.

17  Q  Why was that?

18  A  Because the verification call is a call that -- it's proof

19    that the person agreed to the policy.  So with that being

20    said, we needed a full call of them agreeing to the terms of

21    the policy before we could move forward.

22  Q  So how often would these people kick when you were in

23    verification?

24  A  With me?  Not that often.

25  Q  Why is that?

1  A   Because I'm awesome.  But because of my personality.  People

2      didn't really kick with me.  I'll be honest.  I didn't have

3      too many kicks.  But if I did, then I knew how to handle it.

4  Q   How would you handle it?

5  A   In the sense of just, I would just re-explain what I just

6      went over on the call and then they -- if they needed like a

7      deeper explaining, since I had came from customer service, I

8      actually knew how to deeper explain things more than the

9      other agents.

10 Q   What are the common reasons that people would kick?

11 A   They would kick for all types of stuff, to be honest.  But

12     let's see.  If we were selling an indemnity, if they were

13     selling an indemnity policy, sometimes they would kick on the

14     part where we went over like the specific indemnity benefits,

15     where it was like, they would get a hundred per day for a

16     doctor's visit or something like that.  They would kick on

17     those parts sometimes.  They would kick on like the

18     contestable period, the two-year contestable period part,

19     which that's just a known law with insurance, period.  I

20     guess that would be like the main parts.  Oh, and the

21     cancelation too.

22 Q   What about the cancelation?

23 A   So it was like a part in there where it would state you had

24     ten to 14 -- or ten to 30 days or whatever the case it is to

25     cancel a policy and receive a full refund.  Like on those

1    parts, they would be like, well -- and sometimes they kicked

2    on price.  Everybody -- that's with any type of sales.

3    People kick on price sometimes.

4  Q  At some point, you got your insurance license.  Where were

5    you at in the company when you got your insurance license?

6  A  In verification.

7  Q  Okay.  Why'd you get your insurance license?

8  A  Honestly don't know why, but it was eventually required of

9    all of us to have it.

10  Q  And how long were you in the verifications?

11  A  That was my longest time.  So I guess I was there for like, I

12    would say -- maybe it wasn't my longest time, but two, three

13    years.  It felt like the longest.

14  Q  Why did you leave verification?

15  A  We -- well, most of the people that was in verification got

16    laid off.

17  Q  Why'd they get laid off?

18  A  I believe because they were outsourcing verification.

19  Q  Outsourcing the verification to where?

20  A  To Panama, to have different agents doing the verification

21    side, and they switched us to do customer service.

22  Q  Okay.  So they weren't going to have the folks in America do

23    the verification anymore.  That was going to be Panama?

24  A  We had expanded at that point.  Way more agents, way more

25    everything.

1    Q    Okay.  And where did you go from customer service?

2    A    Where did I go from customer service?

3    Q    I'm sorry.  Where'd you go after verification?

4    A    To customer service.

5    Q    Back to customer service?

6    A    But a different building.

7    Q    What building were you in at that time?

8    A    Like the building next to that building.

9    Q    Okay.  Was that the Oakwood location?

10   A    Uh-uh, no.  It was still the same location.  Just a different

11        part of that -- like we had to actually walk outside to get

12        between the buildings, so a different part.

13   Q    And at some point, the company changed its name, didn't it?

14        From Health Benefits Center?

15   A    Yes.

16   Q    To what?

17   A    Simple Health.

18   Q    And about when did that occur?

19   A    Don't quote me on this because I'm not sure, but I believe it

20        happened when we went to the Oakwood location.  I don't think

21        it was Simple Health when we were at the other location.

22   Q    Okay.  And how long were you back in customer service?

23   A    For a while.

24   Q    All right.  What did they have you doing in customer service

25        when you got back there?

1  A   When I got back, I became a part of the rewriting team and

2      the saves team.

3  Q   Okay.  First of all, what is the saves team?

4  A   That's the people that were good at saving deals, meaning not

5      getting -- people not canceling.

6  Q   And you were one of the people that was good at saving deals

7      and getting people to not cancel?

8  A   Yes.

9  Q   All right.  How long were you on the saves team?

10 A   I wasn't on there long because I was a better writer, like

11     with the rewrite department.  They were -- how do I explain

12     it?  They coincided with each other basically.  So I did more

13     of the rewriting because I actually understood the policies

14     and I was -- I ran the rewriting team.  I was one of the

15     people that knew how to sign someone up and was good at

16     sales.

17 Q   All right.

18 A   At that time.

19 Q   Let me ask you, what is the rewriting team?

20 A   Rewriting is when someone was sold a policy that didn't meet

21     their needs, so I sold them a policy that did.  I resold them

22     a policy that did.

23 Q   Okay.  And you resold them what type of policy?

24 A   A short-term medical plan.

25 Q   Short-term medical plan?

1    A    Or a higher indemnity plan.

2    Q    What's a higher indemnity plan?

3    A    So there's levels to indemnity plans.  Well, you have like a

4         first level, go all the way up to like a fifth, sixth level.

5         They -- the benefits increase as the level increases.  So

6         maybe they were sold like a Level 1 indemnity plan, but they

7         really needed a Level 6 indemnity plan.  At that point, I

8         would up their coverage.  Though it may cost them more, it

9         was better coverage for them, or I would change it into a

10        short-term major medical plan where it was better coverage

11        for them.

12   Q    How would a person get to you as the rewrite person?

13   A    Instead of going back to the sales agent -- well, no.  No,

14        no, no.  So in saves, they would do their best to save the

15        deal.  If the person still wanted to cancel and they could

16        convince them to speak with me to maybe get them into a

17        better plan, then they would then transfer them over to me.

18   Q    Okay.  All right.  So it's the people that got transferred to

19        the saves team, if -- rather than canceling them, they

20        transfer to you at the rewrites; is that what I'm getting?

21   A    Yes.

22   Q    Okay.  And then you said you would rewrite them either to a

23        higher indemnity plan or a short-term major medical plan?

24   A    Yes.

25   Q    Okay.  So Simple Health had these short-term major medical

| | | |
|---|---|---|
| 1 | | plans that could be sold; right? |
| 2 | A | Yes. |
| 3 | Q | So why does a person have to go through customer service, |
| 4 | | saves, and then get -- go to rewrites to hear about these |
| 5 | | short-term major medical plans? |
| 6 | A | That's a trick question, because their sales agent that they |
| 7 | | initially had didn't go over it, I guess. |
| 8 | Q | Now you were in sales for a time; right? |
| 9 | A | Yes, after the rewrite department, I left and went to sales. |
| 10 | Q | Were these short-term major medical plans being offered |
| 11 | | when -- in the sales department? |
| 12 | A | Yes. |
| 13 | Q | How often? |
| 14 | A | Are you asking in regards to me, or in regards to other |
| 15 | | people? |
| 16 | Q | Let's -- yeah.  Let's say in general for the department. |
| 17 | A | The short-term medical plans were offered.  They were |
| 18 | | offered -- with some states, that's the only thing that was |
| 19 | | available.  And they were offered if the person could afford |
| 20 | | them too, because indemnity policies were cheaper. |
| 21 | Q | Was there a difference in commissions that the company would |
| 22 | | earn on the limited indemnity plans versus the short-term |
| 23 | | medical? |
| 24 | A | Yes. |
| 25 | Q | What was the difference in commissions? |

1    A    It was like a huge difference.  Like indemnity plans, I think

2         they pay like 70 to 80 percent commission on.  And like

3         short-term medical plans, they pay like 30 to 50.

4    Q    Okay.  Because of that difference in commission, was -- were

5         the -- or the limited indemnity plans pushed over the major

6         medicals?

7    A    It wasn't that they were necessarily pushed over them.  Our

8         sales agent, we had our own -- we could do what we wanted to

9         do.  But if you're looking at a paper and you see -- most

10        people prefer more money than less money.  So if you're

11        looking at a paper and you see, okay, this is the commission

12        payout you would get for this, then in that sense, they would

13        sell the one that was going to pay them out more.  They made

14        more money.

15   Q    All right.  You were in the rewrites department.  How long

16        were you in rewrites?

17   A    I would say like a year and a half.

18   Q    Okay.  And where'd you go after that?

19   A    To sales at that point.

20   Q    Why'd you go to sales?

21   A    I went to sales because I just -- me and Cam did not get

22        along.  That's my best thing I could say.

23   Q    And who was the supervisor in sales?

24   A    John.

25   Q    John Sand?

1  A    Mm-hmm.

2  Q    Was John Sand pretty much in the office every day?

3  A    He was always in the office.

4  Q    And what building were you in at that time?

5  A    That was at Oakwood.

6  Q    Was that the big building?

7  A    Yes.

8  Q    Okay.  And where did he work from in that Oakwood building?

9  A    He had like a small desk like a secretary on the side.

10 Q    Was the desk in the big room where all the sales agents were?

11 A    Yes.

12 Q    What did Mr. Sand do throughout the course of the day?

13 A    He walked around.

14 Q    Okay.  Walked around where, on the sales floor?

15 A    Yeah.  And he helped uplift us, the energy -- make sure the

16      energy was good.  He walked around the sales floor.  He had

17      like a headphone in, ear set, headset in.

18 Q    Headset, what was the headset for?

19 A    To listen into calls.

20 Q    So could he listen in on any sales agent's call at any time?

21 A    Yes.

22 Q    And did he ever have any meetings where he addressed the

23      sales staff?

24 A    We had meetings all the time.  Like regularly we had

25      meetings.  Sometimes even the owner would speak, Steve.  He

1        would even speak, where it was just to uplift us.

2    Q   Uplift you?

3    A   Mm-hmm.

4    Q   Does that mean try to get you more sales?

5    A   Either do good for that day -- yeah, I guess, to make more

6        sales.  That was the overall reason.

7    Q   You said sometimes even the owner Steve Dorfman would address

8        you and try to uplift you and get you to make more sales?

9    A   It would be very slim to none, but it happened sometimes.

10   Q   How were you paid in sales?  Were you paid salary, were you

11       paid commission?  How did it work?

12   A   Commissions only.

13   Q   So you only made money if you sold policies?

14   A   Yes.

15   Q   And we talked about the scripts that you had in customer

16       service and verification.  Did you have a script to read in

17       the sales department?

18   A   Yes.

19   Q   When you're in sales, were you aware of the number of sales

20       that other agents were making?

21   A   Yeah, we could see it on the board.

22   Q   Okay.  What's this board?

23   A   It was like the sales agents in order, based off the amount

24       of sales that they had for that day, and then I think it had

25       like a week on there too.

1    Q    Okay.  So could you kind of compare yourself in terms of how

2         many sales you're making versus other sales agents?

3    A    Yes.

4    Q    Were you one of the top selling agents there?

5    A    I was like middle.

6    Q    Middle?

7    A    Mm-hmm.

8    Q    Okay.  Did you follow the sales script?

9    A    Yes and no.

10   Q    What do you mean yes and no?

11   A    Well, I came from customer service and verification, and then

12        I became a sales agent.  So I knew more than the -- more than

13        the typical sales agent.  So I sold the policies as they

14        were.

15   Q    What do you mean you sold them as they were?

16   A    Like I knew exactly what the policies entailed.

17   Q    Okay.  As a result of that, were there parts of the script

18        that you wouldn't follow?

19   A    Yes.

20   Q    And what parts of the script wouldn't you follow?

21   A    That's a hard one.  Trying to make me remember.  When it

22        was -- the script did say up to 70 percent.

23   Q    Okay.  Did you follow that part?

24   A    Yeah, because that was accurate, that it covered up to

25        70 percent.

1  Q   What parts wouldn't you follow?

2  A   I didn't like the breakdown of how it said -- so it was a

3      breakdown where it would be like, for example, let's say you

4      went to the doctor and you had a $200 doctor's office visit,

5      and let's say -- let's say, I would give them an even lower

6      percentage.

7  Q   A lower percentage than what?  70?

8  A   No, in the script, it didn't say 70 percent.  It said it

9      covered up to 70 percent, and then they would give an

10     example.  So the example was, let's say you go to the doctor.

11     It's $200 for that doctor's office visit.  Your network would

12     then cover, let's say for this example, 50 percent.  And then

13     it will make it a $100 visit and then your indemnity plan

14     will then add that additional $50 of insured benefit.  That's

15     exactly how it went.  And then you would be left with a $50

16     bill.  Or they had another example where you would be left

17     with nothing based off of the plan levels.  Remember, the

18     plan levels to go by, that you were selling them.  Or you'd

19     end up with not paying any co-pay whatsoever.

20 Q   Could you hear the other sales agents on the phones when you

21     were there?

22 A   Yes.

23 Q   Could you hear what they were saying?

24 A   Yes.

25 Q   And did you -- who were the top sales agents when you were in

1     sales?  What were some of those folks' names?

2   A   Johnathan Bercowicz, Ryan, Morgan.  Her name is Lauren.  This

3       is the original person I trained with, but she go by Morgan.

4       I can name a few others, but I don't know all their names.

5       It's been a long time.

6   Q   Okay.  Did you listen to them on the phones?

7   A   I sat right next to most of them.

8   Q   Okay.  Were those sales agents sticking to the scripts?

9   A   No.

10  Q   They weren't?

11  A   No.

12  Q   What were they doing?

13  A   They freestyled a tad.

14  Q   What does freestyle mean?

15  A   Like instead of saying up to 70 percent, they would say

16      70 percent.  They would like -- making the example so that

17      they didn't have to pay out as much.  A lot of people

18      freestyled.

19  Q   Well, did that bother you that these folks are going outside

20      of the script and saying things that they're going to get

21      70 percent off or giving them examples when they're going to

22      owe nothing?  Did that bother you?

23  A   Yeah.

24  Q   Why'd it bother you?

25  A   Because it wasn't true and I know it wasn't true.

1    Q    All right.  So is it accurate to say that you heard these top

2         sales agents just outright lying to people?

3    A    Yes.

4    Q    Okay.  So you heard this.  Did you report this to anybody?

5    A    See, I would speak -- I'm very outspoken, so I would speak to

6         them directly first.  Like, you know, that's not what it

7         covers, because a lot of sales agents really just didn't know

8         for real.  They just went by what they thought they knew.

9    Q    Okay.  So did that get them to stop lying when you spoke to

10        them directly?

11   A    No.

12   Q    Did you report what you heard to anybody?

13   A    I would speak to the sales managers.

14   Q    Sales manager, who's that?

15   A    It's multiple ones.  People under John.

16   Q    People under John.  And what would you tell these people

17        under John was going on on the sales floor?

18   A    I told them before like, So-and-So be lying nonstop.

19   Q    And what was the response?

20   A    That they would take care of it.

21   Q    Did they tell you what they'd do to take care of it?

22   A    No.  I didn't ask either.

23   Q    Would it get taken care of?

24   A    No.

25   Q    So these top sales agents, I think you mentioned Morgan.  Did

| | | |
|---|---|---|
| 1 | | she ever get fired for lying on the phones? |
| 2 | A | No.  Morgan became a sales leader, like she -- she became a |
| 3 | | sales leader. |
| 4 | Q | She got promoted? |
| 5 | A | Yeah.  But she had been there from the beginning too, though. |
| 6 | Q | But just to be clear, she's one of the ones that's lying on |
| 7 | | the phones? |
| 8 | A | Yeah. |
| 9 | Q | All right.  How about this Ryan Bercowicz?  Did he ever get |
| 10 | | fired for lying? |
| 11 | A | No, he got promoted too. |
| 12 | Q | He got promoted? |
| 13 | A | Yeah. |
| 14 | Q | Okay.  What about -- I think you said Johnathan Bercowicz? |
| 15 | A | He didn't get promoted, but he just sold whatever he sold. |
| 16 | Q | He just what? |
| 17 | A | He just sold whatever he sold. |
| 18 | Q | Just kept being one of the top salespeople? |
| 19 | A | Mm-hmm. |
| 20 | Q | How long were you in the sales department? |
| 21 | A | Not long.  Like less than a year. |
| 22 | Q | I'm sorry? |
| 23 | A | It was less than a year. |
| 24 | Q | Okay.  And why'd you end up -- did you end up quitting? |
| 25 | A | Yes. |

1   Q   Why'd you quit?

2   A   Because I just -- it wasn't working for me.  I wasn't -- it

3       wasn't working for me sales wise.  I couldn't sell the way

4       that it needed to be sold for me to make enough money there.

5   Q   Well, would it --

6   A   Because remember, it was commission only.

7   Q   Okay.  You said the way it needed to be sold for you to make

8       money?

9   A   Mm-hmm.

10  Q   Does that mean that the way to sell these policies and make

11      money is to lie?

12  A   No.  It doesn't mean that.

13  Q   What do you mean?

14  A   Because they can sell themselves.  The policies can

15      definitely sell themselves.  But this is a better way to say

16      it.  The leads that we had, the leads that came in, really

17      couldn't afford what they wanted, what the type of coverage

18      they really wanted.

19  Q   Okay.  So when you quit, did you report what you had seen

20      that was going on there?

21  A   I did.

22  Q   And what'd you do to report it?  Who'd you report it to?

23  A   It's the website where you report on.

24  Q   Website for who?

25  A   Please don't quote me.  That was a long time ago.  But the

```
 1         Federal Bureau -- whatever it's called.  NCIS.  No.  I cannot
 2         think of the initials right now.  Please do not judge me.
 3         But I did report it.
 4    Q    Okay.
 5    A    My Florida CFO, that's what it's called.  It's a button you
 6         press to report it.
 7                        MR. VERSEMAN:  Okay.  Pass the witness, Your
 8         Honor.
 9                             CROSS-EXAMINATION
10    BY MR. SIMS:
11    Q    Good morning, Ms. Ruth.
12    A    Good morning.
13    Q    You are correct when you say you have that personality.
14    A    Mm-hmm.
15    Q    I would like to ask you a couple questions if you don't mind.
16    A    Mm-hmm.
17    Q    You stated that people were calling in and their complaint
18         was their doctor was not in the network?
19    A    Yes.
20    Q    Wasn't a lot of the times the doctor actually was in the
21         network?
22    A    Yeah.
23    Q    And once you explained that to them, they were happy?
24    A    Correct.
25    Q    And you would agree with me, a person that was happy or
```

|    |   |                                                                         |
|----|---|-------------------------------------------------------------------------|
| 1  |   | satisfied with their -- with the product that was sold to               |
| 2  |   | them, they're not going to call in, are they?                           |
| 3  | A | No.                                                                     |
| 4  | Q | You're only getting calls from people that have problems that           |
| 5  |   | may or may not be just from a misunderstanding?                         |
| 6  | A | Correct.                                                                |
| 7  | Q | Now this script that you -- when you were in sales, if a                 |
| 8  |   | person stuck to that script, was the script truthful?                   |
| 9  | A | Yes.                                                                    |
| 10 | Q | I mean, it may -- giving you what you thought was something              |
| 11 |   | that rarely happened or never happened, but truthful, it was?           |
| 12 | A | Yes.                                                                    |
| 13 | Q | Okay.  You stated you worked for Cam?                                    |
| 14 | A | Yes.                                                                    |
| 15 | Q | What was your impression of Cam?                                         |
| 16 | A | My impression of her?                                                    |
| 17 | Q | Yes.                                                                    |
| 18 | A | A racist, rude --                                                        |
| 19 | Q | Truthful?                                                                |
| 20 | A | Hmm?                                                                    |
| 21 | Q | Was she truthful?                                                        |
| 22 | A | No, not to me.                                                           |
| 23 | Q | Okay.                                                                   |
| 24 | A | I'm not a bad person.  And --                                            |
| 25 | Q | I understand.  I'm just asking what your impression was and              |

1   you gave it.  Did you happen to meet while you were there a

2   Matthew Spiewak?

3   A   Yes.

4   Q   Am I pronouncing it right?

5   A   Mm-hmm.

6   Q   What was your impression of him?

7   A   He was like a nerdy older guy.

8   Q   Nerdy older guy?

9   A   Yeah.

10  Q   Was he truthful?

11  A   I don't know.  I never held enough conversation to determine

12      it.

13  Q   Okay.  You stated when you started the company, it was small?

14  A   Yes.

15  Q   And it grew?

16  A   Yes.

17  Q   How big?

18  A   Like three offices grew.

19  Q   It tripled its --

20  A   Mm-hmm.

21  Q   You said that they had rebuttals; right?

22  A   Yes.

23  Q   Are you familiar with the term FAQs, frequently asked

24      questions?

25  A   Yes.

1  Q   Those are like rebuttals; right?

2  A   Correct.

3  Q   People -- you'd have questions that people would -- you got a

4      lot of, or frequently asked, and these rebuttals would be

5      answers to those frequently asked questions?

6  A   Yes.

7  Q   Now you also stated about GoodRx.  In order for me to -- yes,

8      anybody can go to Walgreens or CVS and get that GoodRx card;

9      right?

10 A   No, you have to go online to get it.  I don't think you can

11     just -- at that time, you couldn't just get it in the stores.

12     Nowadays you can get it in the stores.

13 Q   Okay.  But back then, you had to go online to get it?

14 A   Correct.

15 Q   But you had to know about it in order to do that; right?

16 A   Accurate, yes.

17 Q   So in that case, knowledge is power?

18 A   Yes.

19 Q   So you were giving these people something that they didn't

20     have when you were referring them because this medication

21     wasn't covered to GoodRx?

22 A   Yes.

23 Q   Did you have any -- did you ever tell my client Steve, did

24     you ever tell him that people were lying on the floor?

25 A   No.

```
1   Q    Did you ever tell him that his top sellers were lying to
2        customers?
3   A    No.
4                    MR. SIMS:  Thank you.
5                    THE WITNESS:  Mm-hmm.
6                         CROSS-EXAMINATION
7   BY MR. RADEFELD:
8   Q    Good morning, ma'am.  How are you?
9   A    I'm good.  How are you?
10  Q    Good.  When was it that the federal agents or the members of
11       the prosecution team here, when did they first contact you?
12  A    It was like -- it's been a long time ago.  Like four or five
13       years ago, I think.
14  Q    Four or five years ago?
15  A    It was a while back.
16  Q    Okay.
17  A    I was still in Florida I think initially.
18  Q    All right.
19  A    I believe so.
20  Q    All right.  I'm not going to hold you to it.
21  A    Please don't.
22  Q    Were you ever told at any point in time that you were under
23       investigation for your role in allegedly misleading
24       consumers?
25  A    No.
```

1   Q   No?  Okay.  And you worked -- what was the -- I know you

2       broke it up in a number of years.  But what was the total

3       amount of time you worked at Simple Health, that was formerly

4       known as Health Benefits Center?

5   A   I would say like five years.

6   Q   Five years?

7   A   Yeah.

8   Q   Okay.  And you worked in -- I just want to get the order

9       right -- customer service first?

10  A   Mm-hmm.

11  Q   Then verification?

12  A   Yes.

13  Q   Then saves?

14  A   Yes.

15  Q   Okay.  And then rewrite?

16  A   Yes.

17  Q   And then sales?

18  A   Yep.

19  Q   Okay.  Was there ever -- was there a department you didn't

20      work at there?

21  A   Nope.  Not one.

22  Q   Not one.  Okay.  So you probably knew more, would you say,

23      than most?

24  A   Yes.

25  Q   Fair to say?  Okay.  And when you were in the customer

1       service, I think I heard you say that one of the things that

2       you did is that you helped explain benefits to individuals?

3    A  Yes.

4    Q  Okay.  And you also heard other people who worked in customer

5       service also talking to the consumers about their benefits?

6    A  Yes.

7    Q  Okay.  And then sometimes you would help them -- well, you

8       had said that consumers would tell you that their doctors

9       wouldn't take the plan; is that right?

10   A  Yes.

11   Q  Okay.  Was there ever a process or a phone number in which

12      you could give them to provide to their doctor so that they

13      could apply to get into that PPO?

14   A  No, we didn't do that.

15   Q  You didn't do that?

16   A  It was on the website, but we didn't do that.

17   Q  Okay.  All right.  And so the website you're referring to is

18      like the leads website?

19   A  No.  It was on the Multiplan website, which is the most --

20      most of the time, that was the network.

21   Q  Okay.  So the Multiplan, can you explain for us what that is?

22      That's the big -- the bigger --

23   A  That's a large network where the doctor would have to accept

24      that Multiplan network in order for them to utilize it, where

25      they would get the discount towards their services.

1    Q    Okay.  And on the Multiplan website, you're talking about,

2         that there was a way in which a doctor could apply to get

3         into that Multiplan?

4    A    Yes.

5    Q    Okay.  And would that be things that you would tell the

6         people?  No?

7    A    I can count on my hand the amount of times I said that.

8    Q    Okay.  Oh, that --

9    A    I probably said it maybe once or twice, but that was not a

10        regular practice, no.

11   Q    Okay.  And then you would say that most people -- a lot of

12        times when people were calling to cancel, it was after that

13        they received their paper copy of the policy or e-mailed

14        copy?

15   A    Yes.

16   Q    And then they would say, hey, this is not what I wanted, I

17        want to cancel it?

18   A    Yes.

19   Q    Okay.  And when you worked in the rewrite team and you would

20        potentially sell these people short-term medical plans; is

21        that right?

22   A    Yes.

23   Q    Okay.  And isn't it accurate to say that a lot of times, that

24        short-term medical plan was not offered to them because it

25        was more expensive?

1    A    It was very much more expensive.

2    Q    Okay.  And it was more expensive than what they would tell

3         you over the phone that they were able to afford?

4    A    Correct.

5    Q    Okay.  And when you worked in the sales department later on

6         in your career at Simple Health, you had said you had worked

7         with John Sand as kind of the head of sales; is that what --

8    A    He was the head of the sales department.

9    Q    Head of it?

10   A    Mm-hmm.

11   Q    Okay.  And you would agree with me that John Sand had nothing

12        to do with the verifications team; isn't that right?  Wasn't

13        his department?

14   A    It wasn't his department.

15   Q    Okay.

16   A    No.

17   Q    And he -- the rewrites team wasn't his department?

18   A    No.

19   Q    Okay.  And that a lot of times during -- throughout the

20        course of the business day, you would just see John with his

21        headset on, listening to calls?

22   A    He was just on the sales floor.  He stayed on the sales

23        floor.

24   Q    Okay.  And you have no personal knowledge as to whether or

25        not John wrote the sales scripts, do you?

1  A   No.

2  Q   Okay.  Do you know if the sales scripts were approved by the

3      third-party administrator of the products sold by Simple

4      Health, which was a business known as HII?

5  A   They approved them.

6  Q   Okay.  And so that, to your knowledge, it was HII who

7      approved the scripts that you all used to do whatever it is

8      you needed to do?

9  A   Yes.

10  Q   Okay.  And I believe you had stated earlier that the script

11      was not misleading, the only misleading was freestyling from

12      sales agents; isn't that right?

13  A   Yes and no.

14  Q   Okay.  And what do you mean by that?

15  A   Okay.  So yes, the freestyling of the agents is what made

16      it -- they did a lot.  Right?

17  Q   Yep.

18  A   The script in itself, it just overexaggerated certain things.

19  Q   Okay.

20  A   But it wasn't not truthful.

21  Q   It was true?  Things were true?

22  A   Some scenarios could be true.  It's just -- they

23      overexaggerated.

24  Q   Okay.  Just -- but that was what HII to your knowledge had

25      approved?

1   A   They did.

2   Q   Okay.  Now you recall meeting with the prosecution team back

3       in December, around December 13th of 2023?  It would have

4       been last month?

5   A   Yeah.

6   Q   Okay.  And in that meeting, isn't it true that you expressed

7       your belief that limited indemnity plans could have been sold

8       even if the customers were told about the limits on the

9       coverage they provided?

10  A   Easy.

11  Q   Easily?  Because the --

12  A   They sell themselves.  The plans can sell themselves.

13  Q   Okay.  And for a lot of these people who didn't call and

14      complain, it was apparently the right product for them;

15      right?

16  A   Correct.

17  Q   Okay.  And you didn't know what the precise limits on the

18      limited benefit plan coverage were when you were selling the

19      product, did you?

20  A   Yes, I did.

21  Q   You did know that, because you worked in these different

22      departments?

23  A   Correct.

24  Q   Okay.

25  A   But everybody else may not have.

1  Q   Exactly.  Okay.  And it was actually HII who sent out the
2      policies; isn't that correct?
3  A   Yes.
4  Q   All right.  And again, these policies contained the details
5      of the -- the precise details of the plan.  Would that be
6      right?
7  A   Yeah, they got their policy benefits.
8  Q   Okay.  And so if you had just worked in the sales department
9      and didn't work in any of those other departments, you never
10     would have seen or know the contents of those summary of
11     benefits, would you have, if your job was just to sell it?
12 A   No.
13 Q   Okay.  And also in that meeting with the prosecution team,
14     you expressed that the policies you were selling at Simple
15     Health did provide some coverage for people who otherwise
16     would have had nothing and who couldn't afford anything else;
17     is that right?
18 A   Yes, at that time.  That was before the Affordable Care Act.
19 Q   Okay.  All right.  And these policies would be good for a
20     completely healthy person who never goes to the doctor?
21 A   Yes.
22 Q   All right.  But not good for people who experienced major
23     medical events?
24 A   Correct.
25 Q   All right.  And do you recall when you worked at Simple

1      Health that the sales agents, including you, were told that

2      you do not sell a policy to people who have cancer, HIV, or

3      other major ailments?

4    A   Yes.

5    Q   Okay.  And do you remember being told that if someone has one

6      of those major ailments like cancer, just terminate the call?

7    A   Correct.

8    Q   Okay.  And while you were at Simple Health, you would

9      sometimes hear people, as you already testified to, going off

10     script and lying to customers; is that right?

11   A   Yes.

12   Q   All right.  And you had already testified that John Sand

13     walking around listening to the calls with his headset on;

14     right?

15   A   Yes.

16   Q   And there were times that you would tell the team leads or

17     what you called the sales managers about these lies being

18     told; is that right?

19   A   Yes.

20   Q   Okay.  But did you ever sit down and talk to John about

21     people saying things?

22   A   Me and John were pretty cool.  I definitely mentioned it a

23     few times.

24   Q   Okay.  Mentioned that -- you knew him back in your Subway

25     days; right?

1  A    Right.

2  Q    But sitting down saying, hey, I'm hearing things people say

3       things they shouldn't be saying?

4  A    Yeah, out of concern.

5  Q    And John seemed concerned about that?

6  A    Yeah.

7  Q    Okay.  And was there a time at Simple Health when the call --

8       where there was a call monitor program in use?

9  A    Yeah.

10 Q    All right.  Something about -- it was a program that would be

11      able to grade your sales calls to see if whether or not you

12      were staying on script?

13 A    Yeah.

14 Q    Okay.

15 A    It was.

16 Q    What?

17 A    You just reminded me of something I forgot about, which is

18      crazy.

19 Q    Okay.  Now did you ever know if HII would do something called

20      a secret shopper, wherein an employee from HII would pretend

21      to be a consumer looking for a plan and then the HII employee

22      would see if the sales agent was staying on script?

23 A    They did do that.

24 Q    Okay.  So you were aware of that?

25 A    Mm-hmm.

1  Q   And that was just an added I guess --

2  A   Compliance.

3  Q   What?

4  A   It was like an added compliance thing.

5  Q   Compliance thing, okay.  And so HII, they wanted to make sure

6      that the people at Simple Health were staying on the script

7      that they approved; is that right?

8  A   Yes.

9  Q   Okay.  And to your knowledge, there was never a separate

10     script that was to be used only when HII was in the building

11     or monitoring calls, were you?

12 A   No.

13 Q   So if someone would say that, that would be outrageous, never

14     heard anything like that?

15 A   Never heard of that.

16 Q   Okay.  Because the only script was the one that was assigned

17     to each product that Simple Health sold that was approved by

18     HII?

19 A   Yes.

20 Q   Okay.  And to those agents who would veer off script, you

21     were aware that John Sand would talk to them; is that right?

22 A   I mean, I didn't see them have a conversation, so I don't

23     know.

24 Q   But you heard about him reprimanding people who would veer

25     off script?

1    A    Sometimes, some people got sent home.

2    Q    Okay.  And that was because of the fact that they were caught

3         lying and not adhering to the script; right?

4    A    Yeah.

5    Q    Okay.  And you were aware that John Sand had actually

6         terminated agents' employment with Simple Health due to the

7         repeated infractions of staying off script and saying false

8         things?

9    A    We had a few, yes.

10                     MR. RADEFELD:  Okay.  All right.  I have nothing

11        further.  Thank you so much.

12                     THE COURT:  Redirect?

13                          REDIRECT EXAMINATION

14   BY MR. VERSEMAN:

15   Q    Ms. Ruth, when did you leave Simple Health?

16   A    Here y'all go with these numbers.  I would think 2017.

17   Q    2017?

18   A    I think.

19   Q    Were you aware that the FTC went in there at some point?

20   A    Yeah.

21   Q    And you were gone by that time; right?

22   A    Yes, I was.

23   Q    Had you been gone for like a year?

24   A    I don't think it was a whole year, no.

25   Q    A little short of a year?

1    A    Yeah, I was already working at a new company.

2    Q    Okay.

3                    MR. VERSEMAN:  That's all I have, Your Honor.

4                    THE COURT:  Any recross?

5                    MR. SIMS:  No, Your Honor.

6                    THE COURT:  All right.  Thank you, ma'am.  You

7         may step down.

8                    THE WITNESS:  Thank you.

9                    THE COURT:  All right.  Counsel, approach the

10        bench.

11                   (Sidebar begins.)

12                   THE COURT:  Who's your next witness?

13                   MR. VERSEMAN:  Terena Baker.

14                   THE COURT:  Is that going to take another hour

15        like this one you think?

16                   MR. VERSEMAN:  Probably about.

17                   THE COURT:  Okay.  Well -- and then how many

18        other after that?

19                   MR. VERSEMAN:  We've got three --

20                   THE COURT:  That are out of state?

21                   MR. VERSEMAN:  Out of state.  I don't think we

22        have any other ones today.

23                   MR. REED:  Not today.

24                   MR. VERSEMAN:  They are additional customers,

25        victims, Your Honor.

| | |
|---|---|
| 1 | THE COURT:  All right.  Well, monitoring your |
| 2 | situation, let's -- let's start with the next witness until |
| 3 | their lunch comes.  We'll break, and then we'll try to get the |
| 4 | ones out of town off -- on and off in the early afternoon so if |
| 5 | we got to cut you loose, at least we're not holding anybody over |
| 6 | a day. |
| 7 | MR. REED:  Okay. |
| 8 | MR. VERSEMAN:  Okay. |
| 9 | THE COURT:  That sound fair enough? |
| 10 | MR. VERSEMAN:  Yes, sir. |
| 11 | MR. SIMS:  Thank you, Your Honor. |
| 12 | MR. RADEFELD:  Yes, sir. |
| 13 | THE COURT:  Okay. |
| 14 | (Sidebar ends.) |
| 15 | THE COURT:  All right.  Call your next witness. |
| 16 | MR. REED:  The government would call Terena |
| 17 | Baker. |
| 18 | THE COURTROOM DEPUTY:  Please raise your right |
| 19 | hand.  Do you swear that the testimony you're about to give |
| 20 | before this Court will be the whole truth and nothing but the |
| 21 | truth? |
| 22 | THE WITNESS:  Yes. |
| 23 | THE COURTROOM DEPUTY:  Please state your full |
| 24 | name and spell your last name for the Court. |
| 25 | THE WITNESS:  Terena Baker, B-a-k-e-r. |

```
1              THE COURTROOM DEPUTY:  Thank you.
2                    DIRECT EXAMINATION
3   BY MR. REED:
4   Q    Good morning, Ms. Baker.
5   A    Good morning.
6   Q    Did you ever work for a company called Simple Health?
7   A    I did.
8   Q    Would you mind if I move your microphone over?
9   A    Sure.
10  Q    Thanks.  It's a little difficult sometimes when you're faced
11       this way and the jury's over there, so I want to make sure we
12       catch them.  All right.  What was your job title at Simple
13       Health?
14  A    Sales.
15  Q    All right.  And a little background, where do you live,
16       Ms. Baker?
17  A    Where do I live?
18  Q    Where do you live, what state?
19  A    Florida.
20  Q    And where are you from?
21  A    Hawaii.
22  Q    Did you finish high school?
23  A    Yes.
24  Q    Did you have a college degree?
25  A    No.
```

1    Q    Do you have any professional certifications or licenses?

2    A    Yes.

3    Q    Okay.  Insurance license?

4    A    Yes.

5    Q    When did you get your first insurance license?

6    A    2006.

7    Q    Okay.  Why did you do that?  Why'd you get your insurance

8       license?

9    A    I got my insurance license to -- I was doing -- well, it's to

10      sell insurance, but I was more or less going in -- it's

11      Medicare.  It was Medicare sales, so same insurance.

12    Q    Is there a personal life event that got you interested in

13      insurance?

14    A    Yes.

15    Q    Can you tell us about that?

16    A    Yeah.  Before I became an agent, I had an episode with my

17      mother.  She was a renal failure patient.  And she was on

18      Medicare and Medicaid, so there was no reason why an

19      insurance person would put her on like a Medicare Advantage

20      plan.  All of that happened.  Couldn't get her medication

21      because of what he did.  And I decided to leave criminal

22      justice and be an agent.

23    Q    Okay.  And now here you are back in court anyway.

24    A    Here I am.

25    Q    Had you sold insurance before starting at Simple Health?  I

1       think you said Medicare?

2    A   I did.

3    Q   What were you selling?

4    A   I started with durable medical equipment.

5    Q   Okay.

6    A   And then ACA.

7    Q   Okay.

8    A   And indemnity.

9    Q   Okay.

10   A   And Medicare prescription --

11   Q   And Medicare prescription --

12   A   -- plans.

13   Q   How many insurance licenses did you have when you started at

14       Simple Health?

15   A   What do you mean by that?

16   Q   How many states?

17   A   25.

18   Q   Okay.  So when -- about when did you start with Simple

19       Health?

20   A   Ending of '15, going into '16.

21   Q   Okay.  And about how long did you work there?

22   A   I left early '17.

23   Q   Okay.  So a little over a year?

24   A   A little.

25   Q   All right.  And you said you did sales?

1    A    Correct.

2    Q    What shift did you work?

3    A    I worked the morning shift.

4    Q    All right.  At what location?

5    A    Hollywood.

6    Q    While you were there, how many sales agents were there

7         working there at a time, about?  A lot, a little?

8    A    50 to 60.

9    Q    Okay.  All right.  How'd that compare to other places you'd

10        worked?

11   A    It was much larger.  I was -- it was much larger than other

12        places, other agencies.

13   Q    Okay.  And what kind of products were the sales agents

14        selling?

15   A    At Simple?

16   Q    Yes.

17   A    Indemnity plans.

18   Q    Did you receive any training?

19   A    Mm-hmm, yes.

20   Q    Tell us about that training.

21   A    I'm going to say it was Monday -- it was a week.

22   Q    Okay.

23   A    The last day was -- the first two days, we learned -- it was

24        more -- I remember more of system training than anything.  We

25        were obviously told what we were selling, and then script

| | | |
|---|---|---|
| 1 | | training, going over the script. |
| 2 | Q | Okay. |
| 3 | A | And then off to the floor on the last day, Friday, just to |
| 4 | | shadow. |
| 5 | Q | Okay.  And who'd you report to when you were a sales agent at |
| 6 | | Simple Health? |
| 7 | A | Who did I report to? |
| 8 | Q | Yeah, who was your boss? |
| 9 | A | I don't remember his name.  But I remember -- |
| 10 | Q | Was there someone overseeing the sales floor as well? |
| 11 | A | Yes. |
| 12 | Q | Okay.  Do you recall his name?  Is he sitting in the |
| 13 | | courtroom today? |
| 14 | A | He is.  I can't remember his name.  Last name Sands. |
| 15 | Q | Last name Sand.  Okay.  And where is he sitting? |
| 16 | A | Right there. |
| 17 | Q | All right.  Can you describe what he's wearing so that it can |
| 18 | | show on the paper that you identified him? |
| 19 | A | That's bad, I can't remember his first name.  He's wearing a |
| 20 | | black -- |
| 21 | Q | Wearing the black suit? |
| 22 | A | Blazer, yeah.  Michael?  I don't know. |
| 23 | | THE COURT:  The computer monitor is right in the |
| 24 | | way. |
| 25 | | THE WITNESS:  Michael?  I want to say Michael.  I |

```
 1              don't know.   Sands.
 2       BY MR. REED:
 3       Q     Who is the CEO of the company?
 4       A     The CEO?
 5       Q     Yes.
 6       A     Is --
 7       Q     Is he in the courtroom today?
 8       A     Yes, he's right there in the other black suit.
 9       Q     All right.
10       A     I don't know -- I've never met him, but -- yeah.
11       Q     Okay.   Do you recall him addressing the sales floor?
12       A     Yeah, I remember.
13       Q     Okay.   When was that?
14       A     I started -- I'm going to say about a month, not even a month
15              that I was on the floor.   Maybe two weeks, three weeks.
16       Q     Okay.
17       A     It was like this big meeting that he had with everyone.   I
18              remember that.
19       Q     On the sales floor?
20       A     Yeah, I was like all ears because I was brand new, so.
21       Q     Right.
22       A     It's nothing you can forget.
23       Q     What did he say?
24       A     I think it was just like a boost, rally, you know, get your
25              sales up, type thing.   I don't know if they did it a lot,
```

1    because I just got there.

2  Q  Okay.

3  A  But I do remember having that.

4  Q  All right.  Was there anything he said that bothered you?

5  A  Yeah.

6  Q  What did he say that bothered you?

7  A  He said that you're not sales -- health care agents.  You are

8     telemarketers.  And that sat with me for a long time.

9  Q  Why did that stick with you?

10 A  Because I was a health care agent, because I put time into

11    getting my licenses, because I worked very hard in making

12    sure that I did the right thing for people.  So I took -- to

13    be told that, knowing that I, you know, took pride in being a

14    health care agent, that -- you know, but I was new, so, you

15    know, maybe that was just the way he spoke to everyone, I

16    think.  I don't know.

17 Q  I'm sorry, go ahead.  I didn't mean to cut you off.

18 A  I just let it -- that's the first time I've ever seen him,

19    but that's what stuck with me.

20 Q  That statement, you're not an insurance agent, you're a

21    telemarketer?

22 A  For sure, yeah.

23 Q  Okay.  Okay.  Let's talk about taking calls.  You said

24    earlier that you were selling indemnity policies; is that

25    right?

1    A    Mm-hmm.

2    Q    What kind of health insurance were customers typically

3         looking for when they called you?

4    A    Health insurance.

5    Q    What kind of health insurance?

6    A    They didn't know.

7    Q    Okay.

8    A    It was health insurance, but major medical health insurance,

9         which is the only thing that people really knew.

10   Q    Yeah.  Okay.  Were you given a sales script?

11   A    Yes.

12   Q    All right.  Based on your training, were you supposed to

13        follow the script?

14   A    Yes.

15   Q    All right.  Would you recognize that script if you heard it

16        or saw it again?

17   A    I think I would.

18   Q    All right.  Did the Simple Health script instruct sales reps

19        to call -- to tell callers we represent many of the major

20        A-rated carriers?

21   A    Yes.

22   Q    Does that sound familiar?

23   A    His name is John.  I just remembered that.

24   Q    Very good.  John Sand?

25   A    John Sands.

1    MR. REED:  Let the record show that the witness

2    has identified the first and last name of Mr. Sand.

3            THE WITNESS:  It was rattling in my head.

4            THE COURT:  Usually doesn't come to me until I'm

5    not in the courtroom.

6    BY MR. REED:

7    Q    All right.  Major A-rated carriers, so leave aside the

8         A-rated part, what did major carriers -- what did that convey

9         to you, that you represented major carriers?

10   A    Major carriers?

11   Q    Yeah.

12   A    Blue Cross, United, the major carriers that a typical citizen

13        would think would be a major insurance carrier.

14   Q    Okay.  Was that what you were selling?

15   A    No.

16   Q    Okay.  Next, did the Simple Health script instruct --

17            MR. REED:  Well, actually, can we put up

18        Government's Exhibit Number 1?  All right.

19   BY MR. REED:

20   Q    Does this look familiar to you, some of the language?

21   A    Mm-hmm, yes.

22            MR. REED:  Okay.  Sandra, could you zoom in on

23        the first question under prequalification and the yes and no?

24        All right.

25

BY MR. REED:

Q    Were you instructed to ask if the individual was currently
     insured?

A    Yes.

Q    Okay.  And if the individual was currently insured, what were
     you supposed to do?

A    Ask what type of insurance they had.

Q    Would you still sell to them?

A    No.

Q    All right.  Would you ever try to sell these indemnity
     policies to someone as a supplemental policy in addition to
     what they already had?

A    No.

Q    Okay.

A    They don't ask if it's a supplement.

Q    In fact, if they already had insurance, you wouldn't try to
     sell them a new policy?

A    Correct.

          MR. REED:  Sandra, if you could go back.  All
     right.  Just leave that page up for now.

BY MR. REED:

Q    Did the Simple Health script instruct sales reps to ask
     callers about preexisting conditions?

A    Yes.

Q    All right.  For qualification purposes, did it matter whether

1    someone had preexisting conditions for the policies you were

2    selling?

3  A    Yes.

4  Q    Okay.  If someone had preexisting conditions, would that

5    change the script that you read after that?

6  A    Yes.

7  Q    How so?  How would it change the script?

8  A    It would no longer be a script, because you stop.

9  Q    You would stop --

10                   MR. REED:  Could we go to page 2?  I'm sorry, I

11    think it's the top of page 3.  Could you zoom in on that top

12    paragraph?

13  BY MR. REED:

14  Q    Do you see that last sentence where it says, joining this

15    plan works similar as if you were getting insurance through

16    an employer, they don't discriminate against any of your

17    preexisting conditions?

18  A    That's like broken wrist that you now need rehab for.  It's

19    not cancer.

20  Q    Okay.  So if someone did have a preexisting condition, you

21    would keep selling, or rather Simple Health instructed you to

22    keep selling, but maybe if it was cancer, you would stop?

23  A    No.  Yes.  Right.  It's the more -- preexisting, we're

24    basically stating if -- it could be anything.  It could be

25    just something like a sprained ankle and if you had to get

```
 1        major medical out there before ACA came around, you wouldn't
 2        be -- they wouldn't accept you, you know, so that's what this
 3        is basically saying.  Those preexistings, not cancer -- you
 4        wouldn't even get this far.
 5   Q    What things would you not get this far for?  Diabetes?
 6   A    If they had cancer.  Diabetes was one.
 7   Q    Okay.
 8   A    HIV.
 9   Q    You would not sell someone with diabetes?
10   A    No.
11   Q    Okay.  You personally or Simple Health?
12   A    Me personally.
13   Q    How about Simple Health in general?
14   A    No.  I think it was on -- we had -- it was before this.  It
15        was a list, maybe about four or five of them.
16   Q    Okay.
17   A    That said, do you have like --
18   Q    This, this, this?
19   A    Ask that.  You would ask that.
20   Q    And if one of those boxes was checked, you would stop
21        selling?
22   A    Correct.
23   Q    Okay.  All right.  Next, what did the Simple Health script
24        instruct sales reps to say about prescriptions and lab
25        coverage?  And I can show you if it's more useful, more
```

```
 1          helpful.
 2                          MR. REED:  Okay.  So we're going to go to page 1,
 3          1 over to 2.  At the bottom there, Sandra, the next page, okay,
 4          I know exactly, yeah, right there.
 5   BY MR. REED:
 6   Q      Did Simple Health tell you -- tell sales reps to tell
 7          customers that they would be getting prescription -- they're
 8          going to look for prescription and lab coverage?
 9   A      Mm-hmm, yes.
10                          MR. REED:  Okay.  And if we go down to page 4,
11          the last paragraph before getting to yeses.  Right there, that
12          last paragraph.  Now -- up above that actually, Sandra.  The
13          previous one.  Okay.
14   BY MR. REED:
15   Q      Does the script say here, name-brands will be highly
16          repriced?
17   A      Yes.
18   Q      Okay.  As far as you know, did the plans you were selling
19          have an actual prescription and lab coverage?
20   A      Say that one more time, I'm sorry.  I was still reading.
21   Q      No, that's okay.  As far as you know, did the indemnity plans
22          that were being sold have prescription and lab coverage?
23   A      As far as I knew.
24   Q      They did?  Okay.  Next, did the Simple Health script instruct
25          sales reps to say there are no limits on the plan's usage
```

1       within the network?

2   A   Yes.

3   Q   Okay.  For the products you sold during your time at Simple

4       Health, were there no limits?

5   A   No, there was -- do you mean if -- how many -- how much they

6       can use the plan?

7   Q   Yes.

8   A   Yeah, there's no limits.

9   Q   No limits on an indemnity plan as far as you were told about

10      the product?

11   A   As far as the in-network repricing.  There's a limit on the

12      cash, but not the in-network repricing.  You're always going

13      to have in-network repricing.

14   Q   Repricing, yes; benefits, no?

15   A   Correct.  Cash benefits, no.

16   Q   Okay.  Did the Simple Health script say there was a zero

17      deductible?

18   A   Yes.

19   Q   What's a deductible?

20   A   A deductible is an amount that you pay before the insurance

21      pays.

22   Q   Okay.  Did the products you'd sold before you went to Simple

23      Health have a deductible?

24   A   Some of them.

25   Q   All right.  Why did these indemnity products not have a

```
1          deductible?
2    A    Because they weren't -- they weren't a major medical plan.
3    Q    Okay.  Next -- this is on page 4 -- did the Simple Health
4          script instruct sales agents to give an example where the
5          customer ended up paying $25 on a $200 bill?
6    A    Yes.
7    Q    Okay.  And if we do the math fast, do you know what an 80/20
8          plan is from your prior experience?
9    A    Mm-hmm.
10   Q    Okay.  Does that sound something like an 80/20, 25 bucks on a
11         $200 bill, where you're paying 25 and they're paying 175?
12   A    Yeah.
13   Q    It's about, insurance pays 80, you pay about 20?
14   A    Pay 20, mm-hmm.
15   Q    Okay.  All right.  Page 4, if we're not already there.  Did
16         the Simple Health script instruct sales agents to tell
17         customers they would pay pennies on the dollar?
18   A    Yes.
19   Q    Does that sound familiar?
20   A    That does sound familiar.
21                    MR. REED:  Okay.  And if we go to page 4, go back
22         up.  Sorry.  Now as you know, most plans, that paragraph at the
23         top, Sandra.
24   BY MR. REED:
25   Q    If you read this paragraph, do you see where it talks about
```

| | | |
|---|---|---|
| 1 | | the entire hospital bill? |
| 2 | A | Yes. |
| 3 | Q | And using that pennies on the dollar, you end up pennies on |
| 4 | | the dollar, the whole idea of this plan is to make your |
| 5 | | out-of-home care expenses as low as possible without you ever |
| 6 | | having to meet a deductible first.  It says all that about |
| 7 | | hospital visits specifically; right? |
| 8 | A | Yes. |
| 9 | Q | Okay. |
| 10 | | THE COURT:  All right.  It's -- it's close to |
| 11 | | noon.  The jurors' lunch is here.  So let's adjourn.  We're |
| 12 | | going to try to get a lot accomplished today.  So does anybody |
| 13 | | need more than a 50-minute break?  All right.  Let's come back |
| 14 | | in 50 minutes.  We are in recess. |
| 15 | | Remember you can't talk about the case.  Don't do |
| 16 | | any research.  Don't look it up. |
| 17 | | (Jury exits at 11:48 a.m.) |
| 18 | | (Recess at 11:48 a.m.) |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

° ° ° ° ° ° ° ° ° ° °

## COURT REPORTER'S CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Dated this 13th day of March, 2024

/s/ Hannah Jagler
_____

Hannah Jagler, RMR, CRR, FCRR
Official Court Reporter